**United States District Court**
For the Northern District of California

1
2
3
4                              NOT FOR PUBLICATION
5                     UNITED STATES DISTRICT COURT
6                    NORTHERN DISTRICT OF CALIFORNIA
7
8    PAUL SOMERS,                              No. C-14-5180 EMC
9              Plaintiff,
10        v.                                   **AMENDED ORDER DENYING (1)
                                               DEFENDANT'S MOTION TO DISMISS;
11   DIGITAL REALTY TRUST, INC., *et al.*,     (2) PLAINTIFF'S MOTION TO
                                               DISQUALIFY DEFENSE COUNSEL**
12             Defendants.
                                               **(Docket Nos. 20, 31)**
13   _____/
                                               **(Revisions in Green Highlight)**
14
15                     **I.    INTRODUCTION**
16            Plaintiff Paul Somers brought this lawsuit against his former employer, Digital Realty Trust,
17   and Ellen Jacobs, a Senior Vice President at Digital Realty Trust (collectively, Digital Realty, or
18   Defendants). *See* Docket No. 1 (Complaint); *see also* Docket No. 38 (Ellen Jacobs Decl.) at ¶ 2.
19   While Somers' complaint pleads five separate causes of action, including claims for discrimination
20   on the basis of his sexual orientation and defamation, Digital Realty's current motion to dismiss
21   challenges only one cause of action: that Digital Realty violated the anti-retaliation provisions of the
22   Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank, or DFA)
23   where it allegedly terminated Somers' employment in retaliation for his making internal reports of
24   securities law violations. *See* Complaint at ¶¶ 44-51; Docket No. 20 (Motion to Dismiss).
25   Specifically, Digital Realty argues that Somers' Dodd-Frank claim fails as a matter of law because
26
27
28

**United States District Court**
For the Northern District of California

Somers doesn't qualify as a "whistleblower" under the statute.[1]  For the reasons explained below, Digital Realty appears mistaken.  The Securities and Exchange Commission (SEC, or Commission) has formally issued a rule that clarifies the scope and meaning of the whistleblower protections of Dodd-Frank, and extends the protection of those provisions to individuals like Somers who report suspected violations not to the SEC, but to internal management.  Because the Court finds that the SEC's rule is entitled to *Chevron* deference, Digital Realty's motion to dismiss is **DENIED**.

Also pending before the Court is Somers' motion to disqualify Defendants' counsel, Seyfarth Shaw, for a purported conflict of interest.  Because Seyfarth Shaw's prior representation of Somers – for a total of 2.1 hours of billable time – is not "substantially related" to its current successive representation of the Defendants, disqualification is not appropriate.  This motion is also **DENIED**.

## II.   BACKGROUND

A.   Background Relevant to Digital Realty's Motion to Dismiss

Somers was hired by Digital Realty in July 2010.  Complaint at ¶ 10.  According to Plaintiff, Digital Realty "operates as a real estate investment trust" that "owns, acquires, develops and manages technology-related real estate."  Complaint at ¶ 13.

Somers worked as a Vice President of Portfolio Management at Digital Realty, first in Europe and then in Singapore.  *Id.* at ¶¶ 10, 15.  In Singapore, Somers reported to Senior Vice President Kris Kumar, who headed up the Asian Pacific region for Digital Realty.  *Id.* at ¶ 15.  "Shortly before Plaintiff's wrongful termination by Defendant Digital, Plaintiff made complaints to senior management regarding actions by Kumar which eliminated internal controls over certain corporate actions in violation of Sarbanes Oxley."  *Id.* at ¶ 22; *see also id.* at ¶ 46 ("Plaintiff complained to Defendant Digital's officers, directors, and/or managing agents that certain of Kumar's activities violated requirements for internal controls established by [] the Sarbanes-Oxley Act of 2002.").  According to Somers, Kumar had committed a number of acts of "serious

---

[1] Digital Realty also argued that Somers could not maintain a cause of action for whistleblower retaliation under the Sarbanes-Oxley Act directly because Somers did not exhaust his administrative remedies.  Somers states in his opposition brief that he did not plead or intend to bring a Sarbanes-Oxley whistleblower claim, *see* Docket No. 21 at 1, and so Defendants' motion to dismiss any such claim is currently unripe.

1  misconduct," including "hiding [] seven million dollars in cost overruns on a development in Hong

2  Kong."  *Id.* at ¶ 27.

3      Somers was fired by Digital Realty on April 9, 2014.  According to Somers, he was fired (at

4  least in part) in retaliation for internally reporting Kumar's alleged violation(s) of Sarbanes-Oxley or

5  other applicable laws.  *See* Complaint at ¶ 50.  It is undisputed that Somers never reported Kumar's

6  alleged violations to the SEC or any other outside enforcement agency.  *See* Docket No. 21

7  (Plaintiff's Opposition to Motion to Dismiss) at 2.

8  B.      Background Relevant to Somers' Motion to Disqualify

9      Before going to work for Digital Realty, Plaintiff was represented by a partner at Seyfarth

10  Shaw, Eugene Jacobs.[2]  Docket No. 34 (Somers Decl.) at ¶ 2.  According to Mr. Jacobs, he gave a

11  presentation on April 20, 2010, to executive clients of "Kensington International, an executive

12  recruiting and placement firm."  Docket No. 39 (Eugene Jacobs Decl.) at ¶ 3.  At the April 20

13  presentation, Mr. Jacobs "prepared a standard discussion outline called 'Executive Employment

14  Agreement Issues for Consideration' that contains a general overview of issues and discussion

15  points for things to consider when negotiating executive employment agreements."  *Id.* at ¶ 4.  A

16  copy of the outline indicates that the topics discussed at the April 20 meeting included how to

17  negotiate a new executive's title with the hiring company, executive benefits, and termination

18  provisions.  *Id.* at Ex. A.

19      Sometime after the presentation, Mr. Jacobs avers that he was contacted by Susan Duda, an

20  executive coach at Kensington International, asking for an additional copy of the discussion

21  handout, "presumably so she could share it with [her client] Mr. Somers."  Eugene Jacobs Decl. at ¶

22  7.  Jacobs sent Duda the discussion handout.  *Id.*  Two days later, Ms. Duda "sent Mr. Somers'

23  resume to me and told me that he may contact me about legal representation.  Later that day, Mr.

24  Somers engaged me to provide legal advice regarding his potential employment agreement with

25  Newcastle Limited, a Chicago-based real estate advisor and investor."  *Id.* at ¶ 8.  According to Mr.

26  Jacobs' time records from April 22, 2010, he spent .8 hours on a "[t]elephone conference [with] P.

27  

28  _____
    [2]  Mr. Jacobs is not related to Defendant Ellen Jacobs.  Ellen Jacobs Decl. at ¶ 10.

**United States District Court**
For the Northern District of California

1   Somers regarding employment matter issues and strategies."  Somers Decl., Ex. A (Bill from

2   Seyfarth Shaw to Somers).

3        On April 26, Mr. Jacobs contends that Somers "sent me documents that Newcastle had sent

4   him about the position for which he interviewed, including an offer letter template, job description,

5   and summary of employee benefits available to Newcastle employees."  Eugene Jacobs Decl. at ¶

6   10.  Mr. Jacobs' time records indicate that he conducted a 1.3 hour-long telephone conference with

7   Somers that day to "review Newcastle offer letter and related documents; identify issues."  Somers

8   Decl., Ex. A.  These two telephone conferences, lasting 2.1 hours in total, are the only legal work

9   Jacobs (and Seyfarth Shaw) performed for Somers.  *See* Somers Decl. at ¶ 5.

10       According to Jacobs, he next heard from Somers on April 30, when Somers "advised me that

11  his negotiations with Newcastle had stalled."  Eugene Jacobs Decl. at ¶ 11.  Somers then "emailed

12  [Jacobs] out of the blue" in June 2010 to tell him "that he had already accepted a position with

13  Digital Realty Trust."  Eugene Jacobs Decl. at ¶ 12.  According to Jacobs, he "had no input

14  whatsoever in any negotiations, if there were any, or other terms and conditions relating to Mr.

15  Somers' employment with Digital Realty."  Jacobs further declares that:

16           Mr. Somers never sought any legal advice of any nature from me in
             connection with the job at Digital Realty, nor did I provide any legal
17           counsel to him regarding Digital Realty in any regard whatsoever.  In
             addition, Mr. Somers did not share any confidential information with
18           me about his job at Digital Realty.  My representation of Mr. Somers
             was limited to advising him on issues relating to the negotiation of an
19           employment agreement with Newcastle.

20  *Id.* at ¶ 14.  Somers confirms that he "did not ask Mr. Jacobs to negotiate [his] agreement with

21  Digital [Realty]."  Somers Decl. at ¶ 2.  However, Somers claims that he used "ideas" from Mr.

22  Jacobs' presentation outline "in other subsequent matters," and that he "obtained my job with Digital

23  Realty Trust, Inc. while still in communication with Mr. Jacobs."  *Id.* at ¶¶ 2-3.  Mr. Somers also

24  claims that he "discussed the Digital Realty opportunity briefly with Mr. Jacobs and informed Mr.

25  Jacobs about some aspects of my approach to obtaining the job with Digital."  *Id.* at ¶ 4.

26  ///

27  ///

28  ///

# III.   DISCUSSION

A.   Defendant's Motion to Dismiss Somers' Dodd-Frank Whistleblower Claim

Digital Realty moves to dismiss Somers' second cause of action, which alleges that Somers was wrongfully terminated from his employment in retaliation for reporting his supervisor's purported law violations to Digital Realty management.  According to Digital Realty, Somers does not qualify as a "whistleblower" under the Dodd-Frank Act because he did not report any alleged law violations to the SEC.  Digital Realty also argues in its reply brief that Somers has not adequately pleaded that his internal reports were either "required or protected" under the Sarbanes-Oxley Act.  *See* 15 U.S.C. § 78u-6(h)(1)(A)(iii).  For the reasons explained below, Digital Realty's first argument is unavailing and its second argument was waived where Digital Realty failed to raise it in its original motion.

1.   Passage of Dodd-Frank and Relevant Statutory Provisions

Dodd-Frank established a new whistleblower program in 2010 by adding Section 21F to the Securities Exchange Act of 1934 (Exchange Act).  *See* Section 21F, codified at 15 U.S.C. § 78u-6. Section 21F "encourages individuals to provide information relating to a violation of U.S. securities laws" through two "related provisions that: (1) require the SEC to pay significant monetary awards to individuals who provide information to the SEC which leads to a successful enforcement action; and (2) create a private cause of action for certain individuals against employers who retaliate against them for taking specified protected actions."  *Asadi v. GE Energy (USA), L.L.C.*, 720 F.3d 620, 623 (5th Cir. 2013).  Courts frequently refer to the award provision as the "whistleblower-incentive program" and the provision protecting whistleblowers from retaliation as the "whistleblower-protection program."  *See id.* at 623 n.3; *see also Connolly v. Remkes*, No. 5:14-cv-01344-LHK, 2014 WL 5473144, at *4 (N.D. Cal. Oct. 28, 2014).  Only the provisions of the whistleblower-protection program are at issue here.

The DFA defines a "whistleblower" as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws ***to the Commission***, in a manner established, by rule or regulation, by the Commission."  15 U.S.C. § 78u-6(a)(6) (emphasis added).  Dodd-Frank forbids employers from retaliating against

whistleblowers, and sets forth specific prohibitions.  Specifically the DFA provides that "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower –

> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter [*i.e.*, the Exchange Act], including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission."

15 U.S.C. § 78u-6(h)(1)(A)(i)-(iii).  The DFA provides that an employee may bring suit against any employer who violates the whistleblower protections codified in Section 21F.  *See* 15 U.S.C. §78u-6(h)(1)(B).  Dodd-Frank further provides that "[t]he Commission shall have the authority to issue such rules and regulations as may be necessary or appropriate to implement the provisions of this section [*i.e.*, the whistleblower program] consistent with the purposes of this section."  15 U.S.C. § 78u-6(j).

An aggrieved whistleblower under the DFA may also have a claim under the Sarbanes-Oxley Act, which created a civil right of action to protect employees from retaliation for reporting law violations.  *See* 18 U.S.C. § 1514A.  However, the remedies and procedures associated with a Sarbanes-Oxley Act anti-retaliation claim are considerably different from those provided under the whistleblower-protection provision of the DFA.  Three main differences bear highlighting.  First, the DFA provides for recovery of two times back pay, whereas Sarbanes-Oxley provides for recovery of back pay without a multiplier, along with other economic damages such as emotional distress damages.  *Compare* 15 U.S.C. § 78u-6(h)(1)(C) *with* 18 U.S.C. § 1514A(c)(2); *see also Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 266 (5th Cir. 2014) (per curiam) (holding that Sarbanes-Oxley "affords noneconomic compensatory damages, including emotional distress and reputational harm").  Second, Sarbanes-Oxley act claimants must first file an administrative complaint with the

United States District Court

For the Northern District of California

1  Department of Labor, whereas DFA plaintiffs are not required to exhaust any administrative

2  remedies. *See* 18 U.S.C. § 1514A(b)(1).  And third, DFA claimants have between six and ten years

3  to file suit from the time a violation occurs, whereas Sarbanes-Oxley plaintiffs must file suit

4  between 180 days after the violation occurs and 180 days after the employee becomes aware of the

5  violation. *See* 15 U.S.C. § 78u-6(h)(1)(B)(iii); 18 U.S.C. § 1514A(b)(2)(D).

6         2.    The SEC Issues Rule 21F-2(b)(1) Interpreting the Whistleblower-Protection

7             Provisions

8      The SEC issued final rules interpreting and implementing Section 21F of the DFA in June

9  2011.  *See* Securities Whistleblower Incentives and Protections (Adopting Release), 78 Fed. Reg.

10  34300, 34301-34304 (June 13, 2011).  In particular, the SEC issued Exchange Act Rule 21F-2(b)(1),

11  which states that for the purpose of the whistleblower-protection program, "you are a whistleblower

12  if . . . [y]ou provide information in a manner described in . . . 15 U.S.C. 78u-6(h)(1)(A)."  *See* 17

13  C.F.R. §240.21F-2(b)(1).

14      As noted above, the DFA – and specifically, section 78u-6(h)(1)(A) – "sets forth three types

15  of protected whistleblower activity, the last of which [*i.e.*, subsection (iii)] includes 'making

16  disclosures that are required or protected under the Sarbanes-Oxley Act.'"  *Connolly*, 2014 WL

17  5473144, at *4 (quoting 15 U.S.C. § 78u-6(h)(1)(A)(iii)).  "In turn, the Sarbanes-Oxley Act affords

18  whistleblower protection to an employee who gives 'information or assistance' to 'a person with

19  supervisory authority over the employee'" *id.* (quoting 18 U.S.C. § 1514A(a)(1)(C)), or to any other

20  "such person working for the employer who has the authority to investigate, discover, or terminate

21  misconduct."  18 U.S.C. § 1514A(a)(1)(C).  That is, Sarbanes-Oxley protects employee disclosures

22  made internally to certain supervisory personnel irrespective of whether the employee separately

23  reports the information to the SEC.  Thus, by providing that an individual is a "whistleblower if"

24  they "provide information in a manner described in" subsection (iii) of section 78u-6(h)(1)(A), Rule

25  21F-2(b)(1) stipulates that the whistleblowing-protection program of the DFA does ***not*** require an

26  employee to report violations directly to the SEC.  *See Connolly*, 2014 WL 5473144, at *4; *Asadi*,

27  720 F.3d at 629 (refusing to defer to SEC interpretation of the DFA, but explaining that Rule21F-

28  2(b)(1) defines whistleblower "broadly by providing that an individual qualifies as a whistleblower

United States District Court

For the Northern District of California

1  even though he never reports any information to the SEC, so long as he has undertaken the protected

2  activity listed in 15 U.S.C. § 78u-6(h)(1)(A)"); *see also* Adopting Release at 34304 (explaining that

3  under the SEC rule, "the statutory anti-retaliation protections apply to three different categories of

4  whistleblowers, and the third category includes individuals who report to persons or governmental

5  authorities other than the Commission").

6            3.      SEC Rule 21F-2(b)(1) is Entitled to Deference

7            The determinative issue for resolving Digital Realty's motion to dismiss is whether SEC

8  Rule 21F-2(b)(1) is entitled to *Chevron* deference.  *See Chevron, U.S.A. v. Natural Res. Def.*

9  *Council, Inc.*, 467 U.S. 837 (1984) (holding that a court should defer to a responsible executive

10  agency's permissible construction of a statute where the statutory language is ambiguous or

11  otherwise does not speak precisely to the question at issue).  If it is entitled to deference, then

12  Somers has pleaded a legally sufficient retaliation claim under Dodd-Frank.  For instance, Somers

13  alleges that he was fired in retaliation for "complain[ing] to Defendant Digital's officers, directors,

14  and/or managing agents that certain of Kumar's activities violated requirements for internal controls

15  established by the Sarbanes-Oxley Act of 2002."  Complaint at ¶ 46.  If, on the other hand, the

16  Commission rule is not entitled to deference, then a fair reading of the DFA requires that Somers

17  must have reported a violation to the SEC in order to have cause of action under the DFA: Since

18  Somers admits that he did not make a report to the SEC before he was fired, he could not be a

19  whistleblower under the DFA.

20            a.      Applicability and Legal Standards of *Chevron* Framework

21            "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron*

22  deference when it appears that Congress delegated authority to the agency generally to make rules

23  carrying the force of law, and that the agency interpretation claiming deference was promulgated in

24  the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *see also*

25  *Navarro v. Encino Motorcars, LLC*, 780 F.3d 1267, 1272 (9th Cir. 2015) (holding that *Chevron*'s

26  reasonableness standard applies to a "regulation duly promulgated after a notice-and-comment

27  period").  Rule 21F-2(b)(1) was promulgated pursuant to an express provision of the DFA and after

28

**United States District Court**

For the Northern District of California

1    a notice-and comment period, and thus qualifies for *Chevron* deference. *See* 15 U.S.C. § 78u-6(j);

2    *see also* Adopting Release at 34300.

3       However, consideration of whether an agency interpretation is permissible under *Chevron*

4    requires an examination of two steps. First, as a threshold matter, the Court must consider "whether

5    Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If so,

6    then the inquiry is over, and we must give effect to the 'unambiguously express intent of

7    Congress.'" *Navarro*, 780 F.3d at 1271 (quoting *Chevron*, 467 U.S. at 842). But if the statute is

8    silent or ambiguous with respect to the specific issue, the Court must proceed to the second step and

9    determine whether the agency's interpretation is "based on a permissible construction of the statute."

10    *Chevron*, 467 U.S. at 843. If the agency's interpretation of the statute "is a reasonable one, this

11    court may not substitute its own construction of the statutory provision," even if the Court believes

12    the provision would best be read differently. *Navarro*, 780 F.3d at 1273 (citation omitted).

13           b.    <u>*Chevron* Step One: The Statute is Ambiguous</u>

14       Under the first step of *Chevron*, the Court must determine whether the whistleblower-

15    protection provisions of the DFA are ambiguous. "The plainness or ambiguity of statutory language

16    is determined by reference to the language itself, the specific context in which that language is used,

17    and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341

18    (1997). General cannons of statutory interpretation are particularly helpful in resolving close cases

19    regarding statutory meaning. *See, e.g.*, *United States v. Monsanto*, 491 U.S. 600, 611 (1989). Here,

20    two interpretative cannons are particularly germane to this Court's inquiry, the surplusage cannon,

21    which holds that a "court should give effect, if possible, to every word and every provision Congress

22    used" in the statute, *Asadi*, 720 F.3d at 622, and the harmonious-reading cannon, which provides

23    that a court should "interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if

24    possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529

25    U.S. 120, 133 (2000); *see generally* Antonin Scalia & Bryan A. Garner, Reading Law: The

26    Interpretation of Legal Texts 174-183 (1st ed. 2012) (discussing the surplusage and harmonious-

27    reading cannons).

28

United States District Court
For the Northern District of California

As Judge Koh recently explained, the "large majority"[3] of courts to consider Dodd-Frank's whistleblower-protection provisions have found ambiguity "in the interplay between §§ 78u-6(a)(6) and 78u-6(h)(1)(A)(iii)" and thus have "deferr[ed] to the SEC's interpretation of Dodd-Frank."[4] *Connolly*, 2014 WL 5473144, at *5. To appreciate the tension between these provisions, it is helpful to first examine the overall structure of Section 21F. As quoted in full above, Section 21F(h)(1)(A) prohibits an employer from retaliating against a whistleblower for: (i) "providing information to the Commission in accordance with this section"; (ii) "initiating, testifying in, or assisting in" an investigation or enforcement action of the Commission "based upon or related to such information"; or (iii) "in making disclosures that are required or protected under" Sarbanes-Oxley, the Exchange Act (including section 78j-1 of the Exchange Act), 18 U.S.C. § 1513(e), or "any other law, rule, or regulation subject to the jurisdiction of the Commission." 15 U.S.C. § 78u-6(h)(1)(A)(i)-(iii). As the statutory language makes plain, subsections (i) and (ii) protect individuals from retaliation for whistleblowing to the Commission about securities law violations. Subsection (iii), however, appears to afford much broader protection, prohibiting retaliatory acts against employees who make much more varied types of disclosures, such as disclosures of securities law violations to an immediate supervisor at their company or to the board of directors. *See* 18 U.S.C. § 1514A(a)(1)(C) (protecting certain disclosures regarding securities laws violations made to

---

[3] The following is a non-exhaustive list of other district courts that have concluded that the DFA is ambiguous and determined that the SEC interpretation of the DFA whistleblower-protection provisions is entitled to deference. *Murray v. UBS Securities*, LLC, No. 12 Civ. 5914 (JMF), 2013 WL 2190084 (S.D.N.Y. May 21, 2013); *Yang v. Navigators Group, Inc.*, 18 F. Supp. 3d 519, 534 (S.D.N.Y. 2014); *Khazin v. TD Ameritrade Holding Corp.*, No. 13-4149 (SDW)(MCA), 2014 WL 940703, at *3-6 (D.N.J. Mar. 11, 2014); *Ellington v. Giacoumakis*, 977 F. Supp. 2d 42, 44 (D. Mass. 2013); *Genberg v. Porter*, 935 F. Supp. 2d 1094, 1106-07 (D. Colo. 2013); *Nollner v. Southern Baptist Convention, Inc.*, 852 F. Supp. 2d 986, 995 (M.D. Tenn. 2012); *see also Egan v. TradingScreen, Inc.*, No. 10 Civ. 8202 (LBS), 2011 WL 1672066, at *4-6 (S.D.N.Y. May 4, 2011) (finding Section 21F of the DFA ambiguous and concluding, without reference to the then-uncodified SEC rule discussed here, that "whistleblower" under the DFA encompasses those who make required internal reports under Sarbanes-Oxley).

[4] As will be discussed below, however, a small minority of courts – including the only appellate court to have ruled on the issue – have held that the language of the DFA is unambiguous and requires a whistleblower to make a report to the SEC in order to qualify for anti-retaliation protection. *See, e.g.*, *Asadi*, 720 F.3d at 629; *Banko v. Apple Inc.*, 20 F. Supp. 3d 749, 756-57 (N.D. Cal. 2013); *Verfeurth v. Orion Energy Sys., Inc.*, -- F. Supp. 3d --, 2014 WL 5682514, at *3 (E.D. Wisc. Nov. 4, 2014). The Court respectfully declines to follow these courts' reasoning.

United States District Court

For the Northern District of California

1 individuals with "supervisory authority" over the reporting employee); 15 U.S.C. § 78j-1 (requiring

2 certain disclosures regarding illegal acts to be made to the board of directors).

3        The tension arises when one considers the definition of a "whistleblower" as codified in

4 Section 21F(a)(6). The DFA only provides anti-retaliation protection to "a whistleblower in the

5 terms and conditions of employment," and Section 21F(a)(6) defines a "whistleblower" as "any

6 individual who provides . . . information relating to a violation of the securities laws ***to the***

7 ***Commission***." 15 U.S.C. § 78u-6(a)(6) (emphasis added). As a number of courts have recognized,

8 Section21F(h)(1)(A)(iii) appears to be "'in direct conflict with the DFA's definition of a

9 whistleblower because [subsection (iii)] provides protection to persons who have not disclosed

10 information to the SEC,'" while Section21F(a)(6) requires the person report to the Commission.

11 *Khazin*, 2014 WL 940703, at *6 (quoting *Genberg*, 935 F. Supp. 2d at 1106); *see also Connolly*,

12 2014 WL 5473144, at *6 (finding statutory ambiguity given the conflict between the DFA

13 provisions). Put differently, the majority of courts to consider the issue have found that subsection

14 (iii) "would be ineffective if whistleblowers must report directly to the SEC." *Connolly*, 2014 WL

15 5473144, at * 6.

16        Digital Realty's arguments that there is no ambiguity or conflict in the DFA – which

17 essentially parrot the arguments made by those courts that have concluded similarly – are not

18 entirely persuasive. The first argument is that because the "whistleblower" definition in Section

19 21F(a)(6) is plain and unambiguous, the plain language of that definition must control over any

20 putatively conflicting statutory text that appears later in Section 21F. *See Asadi*, 720 F.3d at 623-24

21 (holding that there can "only be one category of whistleblower" under the DFA given the "plain

22 language and structure" of the Act); *see also Banko*, 20 F. Supp. 3d at 756 (holding that "the statute

23 specifies that an employer may not [retaliate] against a *whistleblower*. It is not until after this clause

24 that Congress adds protection for reports that are protected by Sarbanes-Oxley, indicating that the

25 latter is subordinate to the former") (emphasis in original).

26        In support of the argument that a clear definitional term must control, the *Asadi* court cites to

27 the Scalia & Garner treatise, which states that "[w]hen . . . a definitional section says that a word

28 'means' something, the clear import is that this is its *only* meaning." Scalia & Garner, *supra*, at 226

United States District Court

For the Northern District of California

(emphasis in original).  But just two pages later, the very same treatise recognizes that while a statutory definition provides a "very strong indication" of a term's meaning, it is "nonetheless one that can be contradicted by other indications.  So where the artificial or limited meaning would cause a provision to contradict another provision, whereas the normal meaning of the word would harmonize the two, the normal meaning should be applied."  *Id.* at 228.  Indeed, just two terms ago the Supreme Court concluded that an express and clear definitional term in a statute may ultimately need to yield to countervailing interpretive factors in order to harmonize the meaning of a statute.  *See Bond v. United States*, 134 S. Ct. 2077, 2091 (2014).  In *Bond*, the Court considered whether a criminal prohibition codified in the Chemical Weapons Convention Implementation Act of 1998 could apply to a defendant whose "amateur attempt . . .  to injure her husband's lover" with common chemicals resulted in the victim suffering a "minor thumb burn readily treated by rinsing with water."  *Id.* at 2083.  The defendant had been convicted under statutory language that rendered it unlawful for any person to knowingly "use . . . any chemical weapon."[5]  *Id.* at 2086; *see also* 18 U.S.C. § 229(a).  Despite the statute's clear definition of "chemical weapon," and despite the fact that the defendant had obviously used a "chemical weapon" with the necessary *men rea*, the Court reversed the defendant's conviction.  *Bond*, 134 S. Ct. at 2091.  Specifically, the majority held that "chemical weapon" could not be given its defined meaning because doing so would violate other principles of statutory interpretation – namely the "background assumption that Congress normally preserves the constitutional balance between the National Government and the States."  *Id.* at 2091.  (citation omitted); *see also id.* at 2097 (Scalia, J. dissenting) (recognizing that a court may ignore the unambiguous words of a statutory definition in the rare case where doing so will interpret the "words fairly, in light of their statutory context").

---

[5]  "Chemical weapon" was defined in relevant part as "[t]oxic chemicals and their precursors . . ." where "toxic chemical" was in turn defined as "[a]ny chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals."  *Bond*, 134 S. Ct. at 2085.  As the Court noted, the ordinary reading of the relevant statutory language would "render the statute striking in its breadth and turn every kitchen cupboard and cleaning cabinet in America into a potential chemical weapons cache."  *Id.* at 2086 (internal quotation marks and citation omitted).

**United States District Court**
For the Northern District of California

1        Indeed, just this Term the Court again found contextual ambiguity in what otherwise

2   appeared to be seemingly clear statutory language.  *See Yates v. United States*, 135 S. Ct. 1074, 1079

3   (2015).  In *Yates*, the defendant had been convicted of violating a provision of Sarbanes-Oxley that

4   prohibited the destruction of a "tangible object" with the intent to obstruct a law enforcement

5   investigation.  *Id.* at 1079.  The Court noted that "although dictionary definitions" of terms such as

6   "tangible object" should "bear consideration, they are not dispositive . . . ."  *Id.* at 1082.  The Court

7   ultimately reversed Yates' conviction – obtained after he destroyed what was indisputably a

8   "tangible object" (fish) with the requisite intent – because the majority concluded that the term

9   "tangible object" in the relevant provision of Sarbanes-Oxley could not be given its dictionary

10  definition in light of the "specific context in which that language is used," including the historic

11  origins and legislative purpose of the law.  *Id.* at 1082; *see also United States v. Carroll*, No. CR-13-

12  566 EMC, 2015 WL 2251206 (N.D. Cal. May 13, 2015) (discussing *Yates*).

13       As both *Bond* and *Yates* demonstrate, a court may decline to strictly apply a definitional term

14  in a statute, or otherwise adopt the plain and ordinary meaning of statutory language, where other

15  tools of statutory interpretation strongly suggest such a result.  According, just because Section 21F

16  expressly defines the term "whistleblower" to require a report to the SEC does not mean that the

17  plain language of that definition *must* control in the face of arguably conflicting statutory language

18  or other persuasive indications of legislative intent.  *See generally Bond*, 134 S. Ct. at 2091.

19       In determining whether the DFA's definition of "whistleblower" itself compels the outcome

20  in this case, the Court must consider the "specific context in which that language is used, and the

21  broader context of the statute as a whole."  *Robinson*, 519 U.S. at 341.  Digital Realty argues that

22  there is no conflict between the provisions of the DFA which would render the statute ambiguous,

23  and thus there is no reason to defer to the SEC's interpretation of the statute.  For the reasons

24  explained below, the Court disagrees.

25  ///

26  ///

27  ///

28  ///

United States District Court
For the Northern District of California

i.   The Whistleblower Definition Would Render Subsection (iii) Superflous Because That Definition Conflicts with Various Provisions of Subsection (iii) Which Clearly Contemplate Only Internal Reports, and not Reports to the SEC

As noted above, the broad language of subsection (iii) is arguably in tension with the narrower definition of a whistleblower contained in Section 21F(a)(6).  As Judge Koh observed in *Connolly*, subsection (iii) would be rendered meaningless by the strict application of  the definition of "whistleblower" under the DFA because subsection (iii) appears to contemplate a broad scope of protection for individuals who do *not* make reports to the Commission.  *Connolly*, 2014 WL 5473144, at *6.  A number of courts are in accord.  *See* footnote 3, *supra*.

Despite the fact that a number of courts have found that subsection (iii) of the DFA "would be ineffective if whistleblowers must report directly to the SEC,"  *Connolly*, 2014 WL 5473144, at *6, the Fifth Circuit has held that the restrictive definition of "whistleblower" articulated in Section 21F(a)(6) does not render Section 21F(h)(1)(a)(iii) superfluous.  *Asadi*, 720 F.3d at 626.  In support of this argument, the Fifth Circuit posited a hypothetical situation whereby the whistleblower protections of Section 21F(h)(1)(a)(iii) could have effect if an employee both internally reported securities law violations to his employer and to the SEC:

> Assume a mid-level manager discovers a securities law violation. On the day he makes this discovery, he immediately reports this securities law violation (1) to his company's chief executive officer ("CEO") and (2) to the SEC. Unfortunately for the mid-level manager, the CEO, who is not yet aware of the disclosure to the SEC, immediately fires the mid-level manager. The mid-level manager, clearly a "whistleblower" as defined in Dodd-Frank because he provided information to the SEC relating to a securities law violation, would be unable to prove that he was retaliated against because of the report to the SEC. Accordingly, the first and second category of protected activity would not shield this whistleblower from retaliation. The third category of protected activity, however, protects the mid-level manager. In this scenario, the internal disclosure to the CEO, a person with supervisory authority over the mid-level manager, is protected under 18 U.S.C. § 1514A, the anti-retaliation provision enacted as part of the Sarbanes-Oxley Act of 2002 ("the SOX anti-retaliation provision"). Accordingly, even though the CEO was not aware of the report to the SEC at the time he terminated the mid-level manager, the mid-level manager can state a claim under the Dodd-Frank whistleblower-protection provision because he was a "whistleblower"

and suffered retaliation based on his disclosure to the CEO, which was protected under SOX.

*Id.* at 627–28.

Digital Realty's reliance on *Asadi* is misplaced.  While the Court assumes, without deciding, that the above hypothetical posited in *Asadi* actually presents one situation where sections 21F(a)(6) and 21F(h)(1)(A)(iii) could be applied in harmony such that the latter section would not be superfluous,[6] the Court finds there are other points of tension between these two provisions.

There are a number of provisions in subsection (iii) that conflict with the assumption that only those who report to the SEC enjoin the whistleblowing protection of the DFA.  For instance, subsection (iii) expressly protects a whistleblower who makes required or protected disclosures under section 78j-1 of the Exchange Act.  *See* 15 U.S.C. § 78u-6(h)(1)(A)(iii).  Section 78j-1(b), entitled "Required response to audit discoveries," provides that an individual conducting an audit of a public company must, under certain circumstances, "inform the appropriate level of the management of the issuer  . . . [of] illegal acts that have been detected or have otherwise come to the attention" of the auditor "unless the illegal act is clearly inconsequential."  15 U.S.C. § 78j-1(b)(1)(B).  Section 78j-1 further requires that if the company (*i.e.* "issuer") does not take reasonable "remedial action" after receiving such a report of illegal acts, an auditor must "directly report its conclusions to the board of directors" of the corporation.  15 U.S.C. § 78j-1(b)(2).  Critically, section 78j-1 only *permits* an auditor to report such "illegal acts" to the SEC *if* the board of directors or other internal management fails to take appropriate remedial action.  *See* 15 U.S.C § 78j-1(b)(3)(B) (providing that an auditor may either resign or report putative law violations to the SEC

---

[6] The Court notes that the SEC has taken the position in various other litigations that the Fifth Circuit hypothetical is flawed because "[w]hether an individual's disclosures constitute a 'protected activity' under the Fifth Circuit's narrow reading of clause (iii) would turn on whether the individual has made a separate disclosure to the Commission.  The Commission contends that if the employer is genuinely unaware that the employee has separately disclosed to the Commission, any adverse employment action that the employer takes would appear to lack the requisite retaliatory intent – *i.e.*, the intent to punish the employee for engaging in a protected activity."  *See* Br. of the Sec. & Exch. Comm'n at 23, *Safarian v. American DG Energy Inc.*, No. 14-2374 (3d Cir. Dec. 11, 2014) (SEC Amicus Br.).  However, under the Fifth Circuit's hypothetical, the defendant would have the intent to retaliate because of the employee's complaint to management; the concurrent complaint to the SEC is not the purported basis of the retaliatory intent but serves the satisfy the gatekeeping function of Section 21(a)(6)'s definition of "whistleblower" entitled to DFA's remedies.

**United States District Court**
For the Northern District of California

where management fails to appropriately respond to an internal report of such violations). That is, section 78j-1 clearly requires internal reporting of illegal acts, and does not contemplate any report of such acts to the SEC, except in limited circumstances. Congress's express mention of section 78j-1 in subsection (iii) of the Dodd-Frank whistleblower protection provision would seem to indicate that Congress wished to cover auditors who made required internal reports about illegal acts. Yet if this Court is required to limit the DFA's protection to those who report to the SEC, nearly all of the conduct "required" under section 78j-1 and its scheme of internal reports would be undermined.

As another example, subsection (iii) clearly covers internal reports required of attorneys under Sarbanes Oxley. *See* 15 U.S.C. § 78u-6(h)(1)(A)(iii) (prohibiting retaliation for disclosures that are "required or protected under the Sarbanes-Oxley Act"). 15 U.S.C. § 7245 requires attorneys to "report evidence of a material violation of securities law . . . or similar violation[s] by the company . . . to the chief legal counsel or the chief executive officer of the company." 15 U.S.C. § 7245(1). Congress has further required attorneys to report such evidence "to the audit committee of the board of directors . . . or to another committee of the board of directors" if "the counsel or officer does not appropriately respond to the evidence." 15 U.S.C. § 7245(2). Similar to Section 78j-1, Sarbanes-Oxley requires attorneys to report certain law violations internally up the chain of command. Indeed, a later-enacted SEC rule provides that attorneys must first report violations internally *before* any eventual report can be made to the SEC, because "[b]y communicating [evidence of a material violation] to the issuer's officers or directors, an attorney does not reveal client confidences or secrets privileged or otherwise protected . . . related to the attorney's representation of an issuer." 17 C.F.R. § 205.3(b)(1). The SEC rule specifically contemplates that attorneys will *not* externally report law violations to the Commission unless a number of preconditions are satisfied. *See* 17 C.F.R. § 205.3(d)(2)(i)-(ii). Indeed, external reports may be prohibited by attorney ethics rules.[7] Applying the narrow definition of "whistleblower" from

---

[7] The Court notes that there has been some controversy between the SEC and certain State Bar Associations, which have argued that an attorney may not report to the SEC without client consent, and that attorneys may be subject to discipline for complying with 17 C.F.R. § 205.3. *See generally The New World of Risk for Corporate Attorneys and Their Boards Post – Sarbanes-Oxley: An Assessment*

**United States District Court**
For the Northern District of California

1   Section 21F(a)(6) to attorneys who have made required internal reports under Sarbanes-Oxley would

2   leave such lawyers largely (if not entirely) unprotected from retaliation under the DFA.

3        In light of these examples, Section 21F(a)(6)'s narrow definition of whistleblower cannot

4   easily be reconciled with Section 21F(h)(1)(A)(iii)'s seemingly expansive scope, which appears to

5   cover conduct under statutes that expressly *require* internal whistleblowing activity to occur before

6   an individual may even consider making a voluntary report to the SEC.

7                    ii.        The Whistleblower Definition Would Render the Words "To The

8                               Commission" in Subsections (i) and (ii) Superfluous

9        Digital Realty (and *Asadi*'s) next argument – that reading the DFA to apply to employees

10  who do not make a report to the SEC would read the words "to the Commission" out of the statutory

11  definition of a whistleblower – is not dispositive. *See Asadi*, 720 F.3d at 625; *Banko*, 20 F. Supp. 3d

12  at 756. While it is true that the SEC's Rule does effectively read the words "to the Commission" out

13  of the definition of whistleblower as Section 21F(a)(6) would apply to (iii), Digital Realty's

14  interpretation itself would create surplusage in subsections (i) and (ii). Section 21F(h)(1)(A)

15  prohibits retaliation against a "whistleblower," which is defined in Section 21F(a)(6) as an

16  "individual who provides . . . information relating to a violation of the securities laws to the

17  Commission." 15 U.S.C. § 78u-6(a)(6). But applying this limited definition of whistleblower would

18  render superfluous the phrase "to the Commission" in subsections (i) and (ii). For instance,

19  subsection (i) prohibits retaliating against a whistleblower "in providing information to the

20  Commission in accordance with this section." 15 U.S.C. § 78u-6(h)(1)(A)(i). This subsection

21  would be entirely unnecessary if, as Digital Realty and the *Asadi* court contend, only persons who

22  provide information to the Commission can ever be whistleblowers. As the Supreme Court has

23  noted, "the cannon against superfluity assists only where a competing interpretation gives effect to

24  every clause and word of a statute." *Microsoft Corp. v. i4i Ltd. P'Ship*, 131 S. Ct. 2238, 2248

25  (2011) (internal quotation marks and citation omitted). Here, no interpretation appears to avoid

26  excess language.

27  ────────────────────────

28  *of Impact and a Prescription for Action*, 2 Berkeley Bus. L.J. 185, 205-2010 (2005).

United States District Court

For the Northern District of California

iii.     The Wording of Sections (i) and (ii) as Compared to (iii) and the
         Legislative History of the DFA Further Supports a Finding of
         Ambiguity

Moreover, subsections (i) and (ii) expressly refer to providing information or testimony to the Commission, while (iii) makes no similar reference to the Commission.  The difference in language, wherein the key qualification articulated in (i) and (ii) is omitted from (iii), suggests a legislative intent that (iii) not be read to require SEC reporting.  *See Sebelius v. Auburn Regional Med. Cntr.*, 133 S. Ct. 817, 825 (2013) ("We have recognized, as a general rule, that Congress's use of 'certain language in one party of the statute and different language in another' can indicate that 'different meanings were intended.'") (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 629, 711 n.9 (2004)).

Indeed, this construction accords with the legislative history.  Subsection (iii) was added to the DFA at the very last minute.  Indeed, subsection (iii) never appears in any version of DFA until it formally passed, nor does it appear to have ever been discussed in the legislative record.  *See, e.g.*, H.R. 4173, 111th Congress (May 27, 2010; Public Print) (last version of Dodd-Frank before passage did not contain relevant subsection).  The conflict between the newly-added (and very broad) subsection (iii) and the narrow whistleblower definition that was consistently present in every version of the bill from its first introduction in Congress, *see* H.R. 4173, 111th Congress (Dec. 2, 2009), could well have been a legislative oversight.  And given the belated addition of subsection (iii), it is at least reasonable to assume that Congress intended for the scope of the DFA whistleblower-provisions to be broader than in earlier versions of the bill, which versions unambiguously required an external report to the Commission in order to be protected from employer retaliation.  *See, e.g.*, H.R. 4173, 111th Congress (May 27, 2010; Public Print) (report to Commission unambiguously required under penultimate draft of Dodd-Frank).  Certainly, the legislative history contains no indication, apart from the definition of whistleblower itself, that Congress purposefully intended to limit whistleblower protections under (iii) solely to those making reports to the Commission.  *See Bond*, 134 S. Ct. at 2091 (even express statutory definitions may be overridden in appropriate circumstances).

**United States District Court**
For the Northern District of California

iv.     The Fifth Circuit's Concerns Regarding Rendering the Sarbanes-Oxley Act Anti-Retaliation Provisions "Moot" are Unfounded

The *Asadi* court also contends that an expansive reading of the Dodd-Frank whistleblower protection provisions would render the Sarbanes-Oxley "anti-retaliation provision, for practical purposes, moot." *Asadi*, 720 F.3d at 628.  According to the Fifth Circuit, an expansive construction "has this impact because an individual who makes a disclosure that is protected by the SOX anti-retaliation provision could also bring a Dodd-Frank whistleblower protection claim on the basis that the disclosure was protected by SOX." *Id.*  But such an individual would be unlikely to file suit under Sarbanes-Oxley *Asadi* tells us, because Dodd-Frank "provides for greater monetary damages," has a longer limitations period, and does not require administrative exhaustion with the Department of Labor before filing suit in federal court.  *Id.* at 629.  This Court disagrees.

The Fifth Circuit overlooked two reasons why individuals might choose to file a claim under Sarbanes-Oxley's whistleblower provisions, either in addition to, or in place of, a DFA claim.  First, certain individuals may actually prefer the administrative forum provided by SOX, especially given that OSHA assumes responsibility for investigating and presenting a retaliation claim under Sarbanes-Oxley.  *See, e.g.*, 29 C.F.R. § 1980.104-1980.105 (providing that OSHA, rather than the plaintiff, will investigate Sarbanes-Oxley whistleblower claims in the first instance and present its findings to an administrative law judge).  Second, while the DFA provides greater back pay than is allowable under SOX, a plaintiff who prevails under SOX can obtain other types of monetary damages not available under the DFA.  For instance, a winning SOX plaintiff can recover damages for noneconomic harms such as emotional distress and reputational harm.  *See* 18 U.S.C. § 1514A(c)(2)(C); *Halliburton*, 771 F.3d at 266 (holding that "the statue affords noneconomic compensatory damages, including emotional distress and reputational harm").  Put simply, there is no reason to suspect that a broad reading of the DFA will put an end to Sarbanes-Oxley whistleblower actions, even if such a consideration were relevant at *Chevron* step-one.

v.     Policy Reasons Support a Finding of Ambiguity

Because this Court believes that the language of the DFA whistleblower-protection provision is at least somewhat in conflict, it is relevant to observe that the Fifth Circuit's resolution of that

1   conflict – reading subsection (iii) narrowly to require a report to the Commission – seems at odds

2   with public policy underlying the DFA.  As Judge Koh has noted, the Fifth Circuit's reading of the

3   law is entirely "contrary to Dodd-Frank's purpose of encouraging reporting of securities violations"

4   and otherwise improving accountability in the financial system.  *Connolly*, 2014 WL 5473144, at \*5;

5   *see also* Pub. L. 11-203, H.R. 4173 (stating that a main purpose of Dodd-Frank is to "promote the

6   financial stability of the United States by improving accountability and transparency in the financial

7   system").  Moreover, reading subsection (iii) to require a report to the SEC  would render the statute

8   "utterly ineffective as a preventive measure because employers would not know that a report was

9   made to the Commission."  *Id.* at \*6.  As the SEC has explained in an amicus brief, "because in [the

10  Fifth Circuit's posited scenario] employers would not know that a report was made to the

11  Commission, clause (iii) would have no appreciable effect in deterring employers from taking

12  adverse employment action for internal reports or the other disclosures listed in clause (iii)."  SEC

13  Amicus Br. at 22.  Put simply, requiring SEC reporting adds nothing to the policy of deterring

14  employer retaliation.

15                           vi.    Summary

16          At bottom, it is difficult to find a clear and simple way to read the statutory provisions of

17  Section 21F in perfect harmony with one another.  While *Asadi*'s interpretation of the statute is not

18  unreasonable, neither is the counterveiling interpretation rendered by a number of district courts.

19  The issue before this Court is not the preferable interpretation, but whether the statute is ambiguous.

20  The Court finds there is sufficient ambiguity to open the door to administrative interpretation and

21  invocation of *Chevron* deference to the SEC's interpretative regulation.  *Cf. Nat'l Ass'n of Home*

22  *Builders v. Defenders of Wildlife*, 551 U.S. 644, 661-66 (2007) (affording *Chevron* deference to

23  agency interpretation because where two statutory provisions present "seemingly categorical – and,

24  at first glance, irreconcilable – legislative commands" there is a "fundamental ambiguity that is not

25  resolved by the statutory text").  The relevant "portions of Dodd-Frank are – at a minimum –

26  susceptible to more than one interpretation when read together."  *Connolly*, 2014 WL 5473144, at

27  \*6; *see also Rosenblum*, 984 F. Supp. 2d at 147-48 ("When considering the DFA as a whole, it is

28  plain that a narrow reading of the statute requiring a report to the SEC conflicts with the anti-

United States District Court

For the Northern District of California

1    retaliation provision, which does not have such a requirement.  Thus, the governing statute is

2    ambiguous.").  For all of the reasons explained above, the Court concludes that the DFA provisions

3    are ambiguous, and thus will proceed on to consider *Chevron* step-two.

4          4.    *Chevron* Step-Two: The SEC Rule is Entitled To Deference

5          Given that the whistleblower protection provisions of the DFA are ambiguous, the next

6    question this Court must decide is whether SEC Rule 21F-2(b)(1) is a "permissible construction of

7    the statute." *Connolly*, 2014 WL 5473144, at *6 (quoting *McMaster v. United States*, 731 F.3d 881,

8    889 (9th Cir. 2013)).  As every court that has considered *Chevron* step-two has concluded, the

9    answer to that question is "yes."  *See id.* ("The SEC's interpretation is a reasonable position that

10   most other courts have adopted"); *see also Khazin*, 2014 WL 940703, at *6 (holding that "the SEC's

11   rule is a permissible construction of the statute and warrants judicial deference"); *Murray*, 2013 WL

12   2190084, at *5 (holding that "the SEC's interpretation is a reasonable one").

13         First, the SEC's interpretation is reasonable because it effectively eliminates the tension

14   between the narrow definition of whistleblower in Section 21F(a)(6) and the seemingly very broad

15   coverage of subsection (iii).  Put simply, the SEC's interpretation is reasonable because it permits a

16   large class of individuals to qualify as protected whistleblowers, a result which appears consistent

17   with the broad language Congress employed in subsection (iii).

18         Second, the SEC's interpretation is reasonable because it "comports with Dodd-Frank's

19   scheme to incentivize broader reporting of illegal activities." *Connolly*, 2014 WL 5473144, at *6;

20   *see also Kramer v. Trans-Lux Corp.*, No. 3:11-cv-1424 (SRU), 2012 WL 4444820, at *5 (D. Conn.

21   Sep. 15, 2012) (explaining that the DFA "appears to have been intended to expand upon the

22   protections of Sarbanes-Oxley"); Pub. L. 11-203, H.R. 4173 (stating that a main purpose of Dodd-

23   Frank is to "promote the financial stability of the United States by improving accountability and

24   transparency in the financial system").

25         Third, the Court finds the SEC's interpretation is reasonable because it encourages internal

26   reporting of possible law violations. As the SEC persuasively explained in an amicus brief, Rule

27   21F-2(b)(1) establishes parity between individuals who first report to the SEC and those who first

28   report internally, thereby avoiding a "two-tiered structure of anti-retaliation protections that might

United States District Court

For the Northern District of California

1 discourage some individuals from first reporting internally in appropriate circumstances, and, thus,

2 jeopardize the benefits that can result from internal reporting."  SEC Amicus Br. at 28; *see also*

3 Proposed Rules for Implementing the Whistleblower Provisions of Section 21F of the Securities

4 Exchange Act of 1934, 75 Fed. Reg. 70488, 70488 (Nov. 17, 2010) (expressing concern that overly

5 incentivizing external reporting would "reduce the effectiveness of a company's existing

6 compliance, legal, audit and similar internal processes for investigating and responding to potential

7 violations of the Federal securities laws"); *id.* at 70516 (expressing concern that the Commission

8 will "incur costs to process and validate" whistleblower "tips of varying quality" if companies are

9 not allowed "to investigate and respond to potential securities laws violations prior to reporting them

10 to the Commission"); Orly Lobel, *Lawyering Loyalties: Speech Rights and Duties Within Twenty-*

11 *First-Century New Governance*, 77 Fordham L. Rev. 1245, 1250 (2009) (arguing that "internal

12 protections are particularly crucial in view of research findings that . . . employees are more likely to

13 choose internal reporting systems").

14      Finally, the Court finds the SEC's interpretation is reasonable because it enhances the

15 Commission's ability to bring enforcement actions against employers that engage in retaliatory

16 conduct.  As the SEC has stated, a narrow reading of Dodd-Frank would "significantly weaken the

17 deterrence effect on employers who might otherwise consider taking an adverse employment

18 action."  SEC Amicus Br. at 29; *see also Connolly*, 2014 WL 5473144, at *6.

19      Put simply, Rule 21F-2(b)(1) appears to be a reasonable interpretation of Dodd-Frank's

20 whistleblower-protection provisions, and thus is entitled to deference.

21      5.    <u>Digital Realty's Remaining Argument is Waived</u>

22      In its reply brief, Digital Realty argues for the first time that Somers' retaliation claim must

23 fail because he did not adequately allege that his internal reports were "protected" under Sarbanes-

24 Oxley and thus he cannot claim under subsection (iii).  Specifically, Digital Realty argues that

25 because Somers did not exhaust his administrative remedies to bring a whistleblower claim under

26 Sarbanes-Oxley directly, his disclosures were not "protected" under Sarbanes-Oxley, and thus the

27 DFA does not apply irrespective of whether Somers could have qualified as a "whistleblower."  *See*

28

**United States District Court**
For the Northern District of California

1    15 U.S.C. § 78u-6(h)(1)(A)(iii) (DFA prohibits retaliation against an individual who makes

2    "disclosures that are required or protected under the Sarbanes-Oxley Act").

3         Because Digital Realty did not make this argument in its initial motion to dismiss, the

4    argument is waived. *See Dytch v. Yoon*, No. C 10-02915 MEJ, 2011 WL 839421, at *3 (N.D. Cal.

5    Mar. 7, 2011) (explaining that parties "cannot raise a new issue for the first time in their reply

6    briefs"); *see also United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) (recognizing the

7    general principle that arguments raised for the first time in a reply brief are waived).  Digital

8    Realty's motion to dismiss Somer's DFA claim is denied.

9    B.    Plaintiff's Motion to Disqualify Defendants' Counsel

10        Plaintiff's motion to disqualify Defendants' counsel, Seyfarth Shaw, must similarly be

11   denied.  "[W]e apply state law in determining matters of disqualification."  *In re Cnty. of Los*

12   *Angeles*, 223 F.3d 990, 995 (9th Cir. 2000).  Rule 3-310 of the California Rules of Professional

13   Conduct provides that a member of the bar "shall not, without the informed written consent of each

14   client . . . [a]ccept or continue representation of more than one client in a matter in which the

15   interests of the clients potentially conflict."  Cal. Rules of Prof. Conduct 3-310(C)(2).  Where the

16   potential conflict arises from the successive representation of clients with potentially adverse

17   interests, as it does here, "the courts have recognized that the chief fiduciary value jeopardized is

18   that of client confidentiality."  *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 283 (1994) (emphasis omitted).

19   "Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel

20   to a successive client in litigation adverse to the interests of the first client, the governing test

21   requires that the client demonstrate a '*substantial relationship*' between the subjects of the

22   antecedent and current representations."  *Id.* (emphasis in original).

23        Under the substantial relationship test, disqualification "turns on two variables: (1) the

24   relationship between the legal problem involved in the former representation and the legal problem

25   involved in the current representation, and (2) the relationship between the attorney and the former

26   client with respect to the legal problem involved in the former representation."  *Jessen v. Hartford*

27   *Cas. Ins. Co.*, 111 Cal. App. 4th 698, 709 (2003).  "[D]isqualification will depend upon the strength

28   of the similarities between the legal problem involved in the former representation and the legal

United States District Court

For the Northern District of California

1   problem involved in the current representation." *Id.* At bottom, "successive representations will be

2   'substantially related' when the evidence before the trial court supports a rational conclusion that

3   information material to the evaluation, prosecution, settlement or accomplishment of the former

4   representation given its factual and legal issues is also material to the evaluation, prosecution,

5   settlement or accomplishment of the current representation given its factual and legal issues." *Id.* at

6   713.

7           Here, the substantial relationship test is plainly not met. Somers hired Eugene Jacobs, a

8   partner at Seyfarth Shaw, to provide 2.1 hours of legal work related to his efforts to secure a position

9   at Newcastle Limited, a Chicago-based real estate advisor and investor. *See* Eugene Jacobs Decl. at

10  ¶ 8. Somers admits that Jacobs did not advise him with regards to his employment contract with

11  Digital Realty. Somers Decl. at ¶ 2. Somers vaguely claims that he "discussed the Digital Realty

12  opportunity briefly with Mr. Jacobs and informed Mr. Jacobs about some aspects of my approach to

13  obtaining the job with Digital," but even if this were true,[8] it would not demonstrate that

14  "information material to . . . accomplishment of the former representation . . . is also material to the .

15  . . accomplishment of the current representation." *Jessen*, 111 Cal. App. 4th at 713. At best, Jacobs

16  provided Somers with advice regarding how to best negotiate an executive agreement, advice that

17  Somers later used when negotiating with Digital Realty. The information that would have passed

18  from Somers to Jacobs in order to "evaluate" or "accomplish" this prior representation has

19  absolutely nothing to do with the "evaluation, prosecution, settlement or accomplishment of the

20  current representation," where Seyfarth Shaw is defending Digital Realty against claims of

21  discrimination, whistleblower retaliation and defamation. Plaintiff's disqualification motion is

22  therefore denied.

---

26  [8] Jacobs denies Somers' vague allegations: "Mr. Somers never sought any legal advice of any

27  nature from me in connection with the job at Digital Realty, nor did I provide any legal counsel to him regarding Digital Realty in any regard whatsoever. In addition, Mr. Somers did not share any confidential information with me about his job at Digital Realty. My representation of Mr. Somers was limited to advising him on issues relating to the negotiation of an employment agreement with Newcastle." Eugene Jacobs Decl. at ¶ 14.

United States District Court

For the Northern District of California

1

2                                  IV.   **CONCLUSION**

3        Defendants' motion to dismiss is denied because Somers has pleaded sufficient facts to

4   establish a plausible claim that he is a whistleblower under the Dodd-Frank Act.  An external

5   complaint to the SEC is not required under Rule 21F2-(b)(1), and that rule is entitled to *Chevron*

6   deference.  The Court finds, and hereby certifies pursuant to 28 U.S.C. § 1292(b), that this aspect of

7   the Court's order is appropriate for interlocutory appeal, as the issue presented "involves a

8   controlling question of law as to which there is substantial ground for difference of opinion and that

9   an immediate appeal from the order may materially advance the ultimate termination of the

10  litigation."  *Id.*; *see also* Docket No. 61 (Order granting Defendants' request to certify for

11  interlocutory appeal, and explaining this Court's reasoning).

12       Plaintiff's motion to disqualify Seyfarth Shaw is denied because Seyfarth's short

13  representation of Somers is wholly unrelated – let alone substantially so – to Seyfarth's current

14  representation of Digital Realty.

15

16       This order disposes of Docket Nos. 20 and 31.

17

18       IT IS SO ORDERED.

19

20  Dated:  July 22, 2015

21                                           _____
                                             EDWARD M. CHEN
22                                           United States District Judge

23

24

25

26

27

28