UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL SOMERS,

          Plaintiff,

    v.

DIGITAL REALTY TRUST INC, et al.,

          Defendants.

Case No. 14-cv-05180-EMC

**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION IN LIMINE NO. 1**

Docket Nos. 331, 332

Plaintiff Paul Somers brings this case alleging that Defendant Digital Realty Trust, Inc. ("DRT") terminated him because of his sexual orientation in violation of Title VII of the Civil Rights Act of 1964. Mr. Somers also alleges that DRT violated California Labor Code Section 1102.5, which protects whistleblower employees from retaliation when they have reported conduct which they reasonably believe to violate the law. Based on these two violations of public policy, Mr. Somers also brings a wrongful termination claim. In addition, Mr. Somers brings a defamation claim against Defendants DRT and Ellen Jacobs, the then-global head of Human Resources for DRT, for allegedly accusing him of "poor performance" and "squatting." Finally, Mr. Somers alleges that DRT breached its contractual obligations to him in several ways.

Defendants filed their motion for summary judgment on June 14, 2018. One week later, on June 21, the Court issued an order advising Mr. Somers as a pro se litigant about the briefing schedule for such motions, directing Plaintiff "to review the requirements of Federal Rule of Civil Procedure 56," explaining that "you cannot simply rely on what your complaint says" but instead "*must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(c)*, that contradict the facts shown in Defendant's [evidence]." Docket No. 336 at 1-2 (emphasis added). The Court "cautioned that, if Plaintiff fails

to file an opposition . . . or fails to submit admissible evidence contradicting Defendant's . . . version of the facts, the *Court may accept Defendant's . . . version of the facts as true" and grant final judgment*. *Id.* at 2 (emphasis added).

In response to Defendants' motion for summary judgment, Mr. Somers thereafter requested two extensions to the briefing schedule. First, Mr. Somers requested a full month extension to his deadline from June 28 to July 26; the Court granted him a two-week extension to July 12. *See* Docket No. On July 12, Mr. Somers requested a one-week extension to July 19. *See* Docket No. 343. Despite the absence of good cause, the Court granted Mr. Somers a partial extension of 4 days in light of his pro se status and because the motion is potentially dispositive to his claims, requiring him to file a response by July 16 (more than a month after Defendants filed the motion). *See* Docket No. 344. Mr. Somers failed to comply with the deadline, filing his opposition on July 17. *See* Docket No. 345. More importantly, Mr. Somers' opposition fails completely to comply with Rule 56 and disregards this Court's earlier admonition: he did not attach any evidence to his brief or cite to evidence in the record. His brief is in outline form, often with nothing but conclusory headings and bullet points without citation to law or evidence, despite the Court's clear guidance to him that he must do so to successfully defeat summary judgment, *see* Docket No. 336. On July 25, the day after Defendants filed their reply brief, Mr. Somers filed a unilateral "notice" that he would file supplemental briefing the next day, without requesting the leave of Court. *See* Docket No. 350. The Court issued an order stating that no further briefing would be permitted. *See* Docket No. 351. No further delays are warranted because the Court has granted Mr. Somers ample opportunity to respond to Defendants' motion.

Moreover, Mr. Somers has had a full opportunity to develop his case. At the outset of this litigation, he was represented by counsel who prepared and filed his first complaint in November 2014. *See* Docket No. 1. Over a year later, in December 2015, Mr. Somers' initial counsel left the case, and Mr. Somers obtained substitute counsel from another law firm. *See* Docket No. 74. Three months later, this counsel moved to withdraw, *see* Docket No. 83, and Mr. Somers thereafter represented himself pro se for several months, *see* Docket No. 95. As early as August 2016, the Court warned Mr. Somers in response to an untimely filing, that although he was a pro

se litigant, he was required to follow federal and local rules of procedure. *See* Docket No. 116 at 1, n.1. By October 2016, Mr. Somers secured new counsel, the third set of counsel to appear on his behalf. *See* Docket No. 140. By the end of that month, however, Mr. Somers' relationship with counsel appears to have disintegrated, *see* Docket No. 146, and counsel moved to withdraw, *see* Docket No. 151. The Court granted the request but advised Mr. Somers that he should seek new counsel and contact the Court's Legal Help Center for legal advice. *See* Docket No. 160. Four months later in February 2017, Mr. Somers still had not retained new counsel, and the Court re-iterated its recommendations. *See* Docket No. 183. Once again in June 2017, the Court encouraged Mr. Somers to locate new counsel. *See* Docket No. 243. However, Mr. Somers has remained pro se since approximately October 2016. Nevertheless, he made robust use of the discovery process as reflected by the numerous discovery disputes filed with and handled by Magistrate Judge Westmore, and has had every chance to prosecute his case. Indeed, Plaintiff has filed at least 25 discovery letter briefs, motions to strike, motions for reconsideration, and a motion for recusal.

For the reasons explained below and on the basis of the papers submitted to the Court, Defendants' motion for summary judgment is **GRANTED**.

## I. FACTUAL BACKGROUND

A.   Mr. Somers' Employment With DRT

Mr. Somers began working for DRT as Vice President of Portfolio management in Ireland. Amended Compl. ¶ 10; Somers Depo. 15:4-6. In 2011, he transferred to Singapore to be the "Number Two" person in charge of the APAC Region reporting directly to Senior Vice President, Kris Kumar. Amended Compl. ¶ 10; Somers Depo. 32:6-9. In that position, he was responsible for establishing and running the daily operations and financial reporting of his portfolio of full-time data centers. Amended Compl. ¶ 17. Mr. Kumar reviewed and approved Mr. Somers' transfer to the APAC Region and selected him to be his second in command. Amended Compl. ¶ 15; Jacobs Decl. ¶ 3.

At the beginning of his employment, Mr. Somers signed "Employment Terms" specifying that he was an at-will employee. Jacobs Decl. ¶ 4, Ex. 3. He also received a stock-grant

3

document with similar language. *Id.*¶ 5, Ex. 2. Finally, he periodically entered into "foreign assignment letters," the most recent operative one signed in Singapore in 2013 and stating that Mr. Somers was not promised employment for a fixed term. Somers Depo. 313:3-20, Ex. 7.

From 2011 to the time of his discharge in April 2014, Mr. Somers lived in and was based in Singapore. Somers Depo. 293:16-23. By all accounts, Mr. Somers received positive evaluations and financial rewards his first few years at DRT in Singapore, including reviews by Mr. Kumar. *See* Jacobs Decl. ¶¶ 8-13, Ex. 4 (2011 review stating "I am impressed with his diligence and dedication to excellence in the tasks he has set out to do" and that Mr. Somers is "a great person to work with" who is "very responsive, adaptable and genuinely interested in building a team with a solid foundation"), Ex. 5 (2012 review stating that Mr. Somers was "cost-conscious and has the right ethic about company spend," "is driven by a sense of urgency for all tasks that he takes on," and "is customer focused and very adept at solving customer problems"). In his last formal work evaluation, however, Mr. Kumar began to state that Mr. Somers' performance was merely "acceptable" in some areas and that there were concerns about Mr. Somers' management and communication style in others. For example, Mr. Kumar recommended that "a positive attitude would make a world of difference" and warned that "Paul needs to work on his communications between his peers," an issue that "[w]e have discussed . . . several times in 2013." Jacobs Decl. ¶ 11, Ex. 6.

B. <u>Performance Issues Prior to Termination</u>

In early 2014, one of Mr. Somers' subordinates, Mr. Sam Lee, complained to human resources that he was uncomfortable with Mr. Somers' suggested revisions to Mr. Lee's self-evaluation. Schubert Decl. ¶ 5. Mr. Lee sent a draft of the self-evaluation for Mr. Somers' feedback before finalizing it. Somers Dep. 387:22-388:16; Lee Decl. ¶ 4;[1] Schubert Decl. ¶¶ 5, 12. Mr. Somers returned a marked up copy with language that Mr. Lee construed as attacking Mr.

---

[1] The Court cites Mr. Lee's declaration as a record reference only, but does not rely on it as material to the outcome of this motion due to Mr. Somers' objections regarding the provenance of the declaration and whether it was actually signed by Mr. Lee (notwithstanding that the objection is unsubstantiated by evidence and based on sheer speculation). The veracity of Mr. Lee's specific testimony is immaterial to the issues raised by this motion.

Kumar, Mr. Somers' boss and the SVP of the APAC region. Lee Decl. ¶ 4, Exhs. 14-15. Specifically, one of Mr. Somers' suggested revisions stated that "I was assigned the Osaka project as the Asset Manager but my role was ended at the decision of the SVP without explanation." Lee Decl., Exh. 15 § 2.2. Another insertion by Mr. Somers stated "We don't work for sales and need to get away from this view in 2014," *id.* § 2.4. Although Defendants characterize this latter phrase as proposed language for Mr. Lee to include in his self-evaluation, in context it actually appears to be a comment from Mr. Somers directed at Mr. Lee. In any case, Mr. Lee claimed to feel uncomfortable that Mr. Somers was trying to pit him against Mr. Kumar. Lee Decl. ¶¶ 5-6.

In February 2014, Mr. Somers instructed one of his subordinates to create a written employment offer to a new hire, side-stepping the normal protocol of consulting human resources; this resulted in an offer of employment being made without human resources' review and without a formal background check. Schubert Decl. ¶¶ 8-10; Jacobs Decl. ¶¶ 15-16. Mr. Somers attempted to justify the offer by stating that it was conditional on an eventual background check, an attitude that perhaps reflects a degree of obstinacy to following human resources' rules. Schubert Decl. ¶ 9.

In the course of investigating these concerns, the local human resources person in Singapore, Sarah Schubert, spoke to various employees who worked with Mr. Somers. One reported that Mr. Somers had asked her if he could review confidential spreadsheets, which made her feel uncomfortable because the documents could not be distributed. Schubert Decl. ¶ 17, 22. Mr. Somers claimed that he simply "politely asked" and the employee stated she could not distribute a copy but volunteered to allow him to take a look on her screen. Jacobs Dep. 332:9-21, Ex. 1109; Schubert Decl. ¶ 22. Other employees reported to Ms. Schubert that Mr. Somers had a hostile attitude toward other departments in the APAC region, Schubert Decl. ¶ 14, 19, Lee Decl. ¶ 12, which manifested in Mr. Somers' requests that, *i.e.*, all communication with those departments be channeled through him, Lee Decl. ¶¶ 12-13, Schubert Decl. ¶ 14.

Some also complained about Mr. Somers' general demeanor as changing from "friendly and engaging" to "incoherent or inconsistent," Schubert Decl. ¶ 16, causing them concern and "creating a very difficult work environment for them to perform in," *id.* ¶ 19. Moreover, some

1    indicated that Mr. Somers had been anticipating Mr. Kumar's departure by saying things like he

2    would leave the company when another individual (Michael Foust) did so.  Schubert Decl. ¶ 19

3    ("Some of the employees told me that Mr. Somers had said to them words to the effect that Mr.

4    Kumar would be leaving the company."); Lee Decl. ¶ 8 ("I did not want anything to do with a

5    personality clash between Mr. Somers and Mr. Kumar.  I believe that Mr. Somers was acting very

6    inappropriately when he told me that 'When Mike Foust leaves Digital, Kris will go too because

7    Mike is Kris's only supporter.'").  Mr. Somers denied to Ms. Schubert that he had made such

8    comments "and said he did not know why people would make things up like that."  Schubert Decl.

9    ¶ 21.  When Ms. Schubert spoke with Mr. Somers about these various reports, he denied them,

10   accused other employees of misconduct, and said that Ms. Schubert was "making issues" "out of

11   things that should never have even been raised."  Somers Dep. 360:17-361:7; Schubert Decl. ¶ 24,

12   20, 21-4.

13       Defendants admit that they did not intend to terminate Mr. Somers based on the

14   aforementioned conduct.  *See* Schubert Decl. ¶ 32 ("[W]e had not discussed terminating Mr.

15   Somers for the concerns raised by the employees I interviewed," but rather address them by

16   "disciplin[ing] him or put[ting] him on a performance improvement plan"); Jacobs Decl. ¶30 ("I

17   was not considering discharging Mr. Somers from employment at this point.  After all, Mr.

18   Somers was a senior executive and had expressly disputed some of the reports.  But, right or

19   wrong, employees had negative things to say about him which made me anxious about attrition.").

20   However, two subsequent discoveries rose, in their view, to the level of terminable offenses.

21   C.    Human Resources Investigation Uncovers New Concerns and Terminable Offenses

22       As part of her investigation into some of the aforementioned employee complaints, Ms.

23   Jacobs undertook a review of e-mails in Mr. Somers' Outlook account.  Jacobs Decl. ¶¶ 31-32.[2]  In

24   _____

25   [2] Ms. Jacobs' review corroborated some of the employee complaints, but that does not appear
     relevant because Defendants concede those complaints were not the basis for termination and
26   Plaintiff does not argue otherwise.  For example, Ms. Jacobs found some examples of
     confrontational language used by Mr. Somers in communication with Mr. Kumar, substantiating
27   some of the employee complaints about his demeanor.  *See, e.g.*, Jacobs Decl. ¶ 33, Ex. 16 (e-mail
     from Mr. Somers to Mr. Kumar stating that he was "concerned about the tone of your e-mail," and
28   that "[p]erhaps your frustration comes from a misunderstanding of the responsibilities of the
     Portfolio Manager's role at [the company] as it stands in other regions").  She also found an e-mail

this review, Ms. Jacobs discovered e-mails indicating that "Mr. Somers hired a video production company at which his brother worked, negotiated a contract on behalf of DRT with his brother directly, and then covered up the financial side of that transaction with his brother, at the very least." Jacobs Decl. ¶¶ 36-45.  Furthermore, Ms. Jacobs heard from Ms. Schubert about a rumor that Mr. Somers "possibly us[ed] a company vendor to paint his apartment in Singapore." Jacobs Decl. ¶ 46.  According to Ms. Jacobs, "any senior manager, including vice presidents, should not use a company vendor for personal work because it could have the optics of a potential conflict of interest" because "[t]he senior manager would be in a position, at least optically, of using the vendor's desire for additional work with DRT for the manager's personal gain." *Id.*  These incidents are discussed in more detail below.

Ms. Jacobs convened a telephone conversation with Mr. Somers, also attended by Ms. Schubert and Rita Da Luz, on April 8, 2014.  *Id.* ¶ 47.  During the conversation, Mr. Somers confirmed his brother's role in the aforementioned contract and that he had not disclosed it to any of his superiors at DRT.[3]  *Id.* ¶¶ 48-51.  Mr. Somers also confirmed that he had hired a DRT vendor to paint his apartment in Singapore.  *Id.* ¶¶ 52-53.  Based on the information learned during the conversation, Ms. Jacobs reported back to Mr. Kumar, and both "agreed that, as such a senior executive in the Region with so much responsibility and signing authority, this sort of conduct was a terminable offense" because "[t]he lack of transparency, the apparent creation of a conflict of interest, and the apparent effort to cover it up was deeply troubling." *Id.* ¶¶ 58-60.  They thus decided to discharge Mr. Somers based on violations of DRT's Code of Business Conduct and Ethics which requires employees to "adhere to the highest standards of business ethics."  *Id.* ¶¶ 60-61.  He was terminated the next day, April 9, 2014.

D.    <u>Post-Termination Events</u>

Termination did not go smoothly.  In particular, DRT and Mr. Somers became embroiled

---

from Mr. Somers to his partner (Raul) which she interpreted as corroborating the rumors that Mr. Somers believed Mr. Kumar would be leaving the company soon; the e-mail is a forward of an announcement of Mike Foust's departure with a note from Mr. Somers to Raul at the top, "Maybe you know who is on his way out as well . . . ."  Jacobs Decl. ¶ 35, Ex. 35.

[3]  He did claim to have told one of his subordinates, Jing.  *See* Jacobs Decl. ¶ 56.

in a dispute over whether Mr. Somers could leave Singapore and what would happen to the balance of his apartment lease. On April 25, 2014, Mr. Somers sent an e-mail to Ms. Jacobs stating that he "will not be in a position to leave Singapore until May 26 as an outside date" and that he would "be responsible for my immigration status from May 15th onward." Jacobs Decl. ¶ 63, Ex. 26. Moreover, he stated that it was "non-negotiable" that he himself would negotiate with his landlord and that "[y]ou may not contact them." *Id.* On May 13, 2014, Ms. Jacobs e-mailed Mr. Somers to request permission to help him negotiate termination of the apartment lease because Mr. Somers had previously stated he would not allow it. Jacobs Decl. ¶ 62, Ex. 22. A couple days later, Ms. Jacobs sent another e-mail attempting to convince him to leave Singapore and vacate his apartment so that she could work with the agent and landlord to terminate the lease. *See* Jacobs Decl. ¶ 64, Ex. 28. Mr. Somers apparently had refused to leave the country because he wanted assurances that he had no outstanding tax liabilities, which the Singapore authorities could use as a basis to refuse him permission to leave the country. *Id.* ¶ 77. But DRT and Ms. Jacobs had already confirmed he had no outstanding liabilities, including with a written assurance from an outside consultant, Deloitte. *Id.* Moreover, DRT provided Mr. Somers a letter guaranteeing that DRT would cover any outstanding tax liabilities which he could use to show the authorities to guarantee smooth exit. *Id.*, Ex. 18. Mr. Somers had apparently received the same advice from Deloitte earlier, on May 9, 2014. *Id.*, Exs. 20, 21. Nevertheless, he ignored it and refused to leave Singapore as DRT had requested and recommended.

## II.        LEGAL STANDARD

### A.    Motion for Summary Judgment

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *McIndoe v.*

*Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994)).

"A moving party without the ultimate burden of persuasion at trial"—here, Digital Realty—nonetheless "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party may discharge its initial burden by "show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Friedman v. Live Nation Merch.*, Inc., 833 F.3d 1180, 1188 (9th Cir. 2016) (quoting *Nissan Fire*, 210 F.3d at 1102). Where "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* (quoting *Nissan Fire*, 210 F.3d at 1102). The ultimate question at summary judgment is whether "the record taken as a whole could . . . lead a rational trier of fact to find for the non-moving party"; if not, then "there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968)); *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

The "party opposing summary judgment must direct [the court's] attention to specific, triable facts." *S. Cal. Gas Co. v. City of Santa* Ana, 336 F.3d 885, 889 (9th Cir. 2003). The court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 2001)). The nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Rather, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to *particular* parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Summary judgment must be defeated with evidence, not simply

1  unsubstantiated statements in the briefing or at a hearing.

2  **B.**  Extraterritorial Application of California Law

3      California's statutes are presumed not to have extraterritorial effect "unless such intention

4  is clearly expressed or reasonably to be inferred from the language of the act or from its purpose,

5  subject matter or history." *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1207 (2011) (holding that

6  the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 does not apply to overtime work

7  performed outside California for a California-based employer based solely on failure to comply

8  with FLSA) (quoting *Diamond Multimedia Systems, Inc. v. Sup. Ct.*, 19 Cal.4th 1036, 1059

9  (1999)).  If the presumption is found to apply, then the court must "proceed to consider whether

10  plaintiffs' proposed application of the [statute] would cause it to operate, impermissibly, with

11  respect to occurrences outside the state." *Sullivan*, 51 Cal.4th at 1207.  To answer that question,

12  the Court focuses on whether "the conduct which gives rise to liability under [the statute] occurs

13  in California." *Diamond*, 19 Cal.4th at 1059.  Courts apply the same analysis to common law

14  claims. *Russo v. APL Marine Servs., Ltd.*, 135 F.Supp.3d 1089, 1096 (C.D. Cal. 2015).

### III.  DISCUSSION

16      Defendant moves for summary judgment on Plaintiff's remaining claims: violation of Title

17  VII of the Civil Rights Act of 1964 on the basis of sexual orientation discrimination; violation of

18  California Labor Code Section 1102.5, which protects whistleblowers from retaliation; common

19  law breach of contract; and common law defamation.  The Court first reviews Plaintiff's motion to

20  strike.

21  **A.**  Plaintiff's Motion to Strike

22      Plaintiff moves to strike the declarations of Sam Lee and Sarah Schubert purportedly

23  because they are "forbidden for use in litigation" and because "the Republic of Singapore requires

24  that evidence obtained within their boundaries must be legalized before it can be released to a US

25  court." Plf.'s Mtn. to Strike at 1.  Both declarations were executed in Singapore but were made

26  "under penalty of perjury under the laws of the United States of America."  Schubert Decl. at 10;

27  Lee Decl. at 4.  Plaintiff does not cite any legal authority to support his claim that declarations,

28  given voluntarily and not under compulsion of a subpoena, require pre-approval of Singapore

before this Court may rely on them. At the hearing, Plaintiff invoked the Hague Convention on Evidence, but that argument fails. *Cf. Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iw.*, 482 U.S. 522, 539 (1987) (rejecting argument that "the Hague Convention [is] the exclusive means for obtaining evidence located abroad"). Plaintiff's motion to strike is **DENIED**.

B.    Title VII of the Civil Rights Act of 1964

Plaintiff alleges that he was terminated because of his sexual orientation as an openly gay man. Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to . . . fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "In order to prevail in a Title VII case, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination." *Vasquez v. Cty. Of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).

Defendants move for summary judgment on the basis that Title VII does not prohibit discrimination on the basis of sexual orientation, that Defendants terminated Plaintiff because of poor performance and violations of company policy, and that Plaintiff has not introduced sufficient evidence that his termination was motivated by sexual orientation or that it was pretextual. The Court addresses each argument in turn.

1.    Whether Title VII Prohibits Sexual Orientation Discrimination

Plaintiff has asserted that Defendants discriminated against him on the basis of his sexual orientation. Defendants cite *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002)*, cert. denied*, 123 S. Ct. 1573 (2003), for the proposition that "the current law of the Ninth Circuit does not recognize sexual orientation discrimination under Title VII." Mot. at 15.

Defendants drastically misread *Rene*. *Rene* holds that sexual harassment is prohibited by

Title VII because of its sexual nature; thus, the motivations of the harasser, and the harasser's views about sexual orientation, are "simply irrelevant." 305 F.3d at 1066. *Rene*, however, takes no position on whether discrimination based on sexual orientation violates Title VII because it constitutes discrimination on the basis of "sex."

There is currently a circuit split on this question. The Second and Seventh Circuits have held that discrimination on the basis of sexual orientation is inherently sex-based discrimination and thus prohibited by Title VII,[4] but the Eleventh Circuit has held otherwise.[5] The circuit courts that have found sexual orientation discrimination cognizable reason that it "is motivated, at least in part, by sex and is thus a subset of sex discrimination" because "sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be, which is an impermissible basis for adverse employment actions." *Zarda*, 883 F.3d at 112. Further, "looking at the question from the perspective of associational discrimination, sexual orientation discrimination—which is motivated by an employer's opposition to romantic association between particular sexes—is discrimination based on the employee's own sex." *Id.* at 112-13. Notably, in 2015, the Equal Employment Opportunity Commission—charged with enforcing Title VII—also took the position that sexual orientation "is inherently a 'sex-based consideration,' and an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under Title VII." *Complainant v. Anthony Foxx, Secretary, Dept. of Transp. (Federal Aviation Admin.), Agency*, 2015 WL 4397641, at *4-5 (EEOC Jul. 15, 2015).

The Ninth Circuit does not yet appear to have weighed in. The Second and Seventh Circuit's holdings in *Zarda* and *Hively* are persuasive. As the *Zarda* court pointed out, sexual orientation is defined as "[a] person's predisposition or inclination toward sexual activity or behavior with other males or females." *Sexual Orientation*, Black's Law Dictionary (10th ed. 2014). For example, "homosexuality" is "characterized by sexual desire for a person of the same sex." *Homosexual*, *id.* As *Zarda* explains:

---

[4] *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018); *Hively v. Ivy Tech Comm. College of Indiana*, 853 F.3d 339 (7th Cir. 2017).

[5] *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248 (11th Cir. 2017), *cert denied*, 138 S.Ct. 557 (2017).

> To operationalize this definition and identify the sexual orientation of a particular person, we need to know the sex of the person and that of the people to whom he or she is attracted. Because one cannot fully define a person's sexual orientation without identifying his or her sex, sexual orientation is a function of sex. Indeed sexual orientation is doubly delineated by sex because it is a function of both a person's sex and the sex of those to whom he or she is attracted. Logically, because sexual orientation is a function of sex and sex is a protected characteristic under Title VII, it follows that sexual orientation is also protected.

*Id.* at 113.

Here, to the extent that Plaintiff alleged that he was treated differently because of his sexual orientation as a gay man, that treatment inherently was based both on his own sex (a man) and the sex of his partner (a man). Thus, under the persuasive reasoning of *Zarda* and *Hively*, Plaintiff may invoke the protections of Title VII against sex-based discrimination, specifically with respect to his sexual orientation. Defendants are not entitled to summary judgment on this basis.

　　　2.　　Whether Plaintiff Has Introduced Prima Facie Evidence of Discrimination

While Title VII prohibits discrimination based on sexual orientation, Plaintiff has failed to introduce prima facie evidence that would support a reasonable inference that his sexual orientation was a factor in his termination. To make a prima facie case, a plaintiff "must offer evidence that gives rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green*[6] or with direct or circumstantial evidence of discriminatory intent." *Vasquez*, 349 F.3d at 640 (original citations, quotations, and alterations removed).

Under *McDonnell Douglas,* unlawful discrimination is presumed if the plaintiff can show that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802).

---

[6] 411 U.S. 792 (1973).

Plaintiff belongs to a protected class and suffered an adverse employment action, termination. Although there may be a material dispute over whether Plaintiff was performing the substance of his work well, it is undisputed that he concealed his brother's connection to a contract that he arranged and that he hired one of DRT's vendors to paint his apartment. He did both without disclosure to or permission from DRT, in violation of DRT's conflict of interests policy and code of conduct. Furthermore, Plaintiff has not identified other employees who engaged in similar conflicts of interest yet were treated more favorably than him. Thus, Plaintiff has not demonstrated a prima facie case under *McDonnell Douglas*.

Nor has Plaintiff introduced direct or circumstantial evidence of discriminatory intent. At his deposition, Plaintiff enumerated all the reasons he believed his termination was discriminatory. First, he claimed that he "was not given the same – the process by which my termination occurred was not standard . . . for Digital Realty." Somers Dep. 304:11-13. Though in theory an unexplained deviation from standard procedures could support an inference of discrimination, Plaintiff has not introduced evidence of what the "standard" procedure for termination would have been, such as a specific company policy or evidence that other persons were in fact afforded greater protections than he received. There is no basis to draw an inference of discrimination.

Second, Mr. Somers claimed that his supervisor, Mr. Kumar "ridiculed my position as second in charge of the company of the region in front of others, in front of my colleagues through the process by which he set up a  -- false reasons for my termination." *Id.* at 304:18-22. His only specific example is that, in meetings, Mr. Kumar would ask him to "tell everybody in the conference room, explain what I did for the company and why it – why it was necessary." *id.* at 314:5-9. Mr. Somers recalled only one instance of this happening at a quarterly senior team meeting in 2012 where Mr. Kumar "took the opportunity to stop the meeting and ask me what I did," and "said that there was no need for my position in the company" and that "other companies didn't have the function that we had." *Id.* at 337:24-338:8; *see also id.* at 339:11. Mr. Somers has not introduced any evidence that Mr. Kumar's treatment, even if deemed adverse, was based on Mr. Somers' sexual orientation.

Third, Mr. Somers claimed that Mr. Kumar "gang[ed] up on [him]" with another

14

colleague, Grant Yabsley, by taking positions opposed to him, *id.* at 315:18-20. However, the only example he recalled was a conversation in January 2014 between Mr. Somers, Mr. Yabsley, and Mr. Kumar wherein "Kris [Kumar] would only look at Grant [Yabsley]" and "would never look me in the eyes." *Id.* at 349:20-350:1. Plaintiff did not introduce evidence that Mr. Kumar's behavior was based on Mr. Somers' sexual orientation.[7]

Fourth, Mr. Somers claimed he was accused of "fabricated" performance issues. *Id.* at 305:4-6. However, he has not connected those "fabricated" accusations to his sexual orientation with any evidence.

Fifth, Mr. Somers states that "when I traveled, someone would take my partner's photograph off my desk and put it inside my drawer." *Id.* at 305:20-22. Mr. Somers did not know who did that and could not recall how many times it happened because "[i]t was a long time ago" and he never complained to anyone in management. *Id.* 307:6-16. This type of targeted behavior directed at a symbol of one's protected status could support an inference of discriminatory intent. However, Mr. Somers did not introduce evidence that Mr. Kumar or Ms. Jacobs (the decisionmakers who terminated him) were responsible for hiding the photographs, were aware that it happened, or were in any way connected to it. Furthermore, his testimony that it happened long ago places it at a remote point in time in relation to his termination. Thus, even if it occurred, Mr. Somers has not introduced evidence to support a reasonable inference that any animus motivating that action also underpinned his termination.

Sixth, Mr. Somers states that he was "consistently" identified as "single" on human resources paperwork despite his same-sex relationship. *Id.* at 309:10-15. The only documents he could identify containing such an error were his Foreign Assignment Letters (his contracts to work overseas). *Id.* at 312:12-23. Yet Mr. Somers admits that he was not married to his partner or in a registered domestic partnership. *Id.* at 310:23-311:7. Thus, he was legally "single" even if he was in a relationship at the time; the HR records therefore were not inaccurate. Even if they were, Mr.

---

[7] Mr. Somers says that Mr. Kumar made other "words and comments" but that "going back that many years, I can't be specific about things that he [Mr. Kumar] said." *Id.* at 316:6-8. He does not identify any specific words and comments and thus lacks any evidence to substantiate his claim.

Somers has not provided evidence that the error was intentional and based on, *e.g.*, a refusal to recognize the legitimacy of a same-sex relationship. Mr. Somers was not able to identify any adverse consequences from these errors, such as loss of benefits, economic value, or otherwise. *Id.* at 311:25-312:9. This paperwork error, if it is one, does not support an inference that Mr. Somers was later terminated because of his sexual orientation.

Seventh, Mr. Somers states that once Grant Yabsley joined the company, "[t]here was definitely a change in Mr. Kumar's approach towards me, and just generally speaking a negative – a negative approach towards me in general with Sales," *Id.* at 306:8-13. Mr. Somers also testified that Mr. Yabsley "would make comments . . . about things that . . . he believed . . . that gay men did," "used to make fun of . . . gay people by doing a limp wrist thing in front of me and laughing," Somers Dep. 316:11-15, used to "ask[] what I did on the weekends, assuming I was off in some clubbing or raves" and "[m]ade jokes about my weekends and what I was doing," *id.* at 317:25-318:8. He did not know how many times Mr. Yabsley did "the limp wrist thing," said it happened "frequently," *id.* at 318:17-20, but could only recall one specific example at a meeting in which a gay Vice President of Sales was in town with his partner and "[Yabsley and a colleague] were making fun of . . . them and asking me something about the hotel or something." *Id.* at 320:8-15. Mr. Yabsley's alleged behavior supports a reasonable inference of his own bias against gay men. However, Mr. Somers does not introduce evidence to connect Mr. Yabsley to his termination. Mr. Yabsley was not one of the decisionmakers.

Finally, Mr. Somers claims that his termination was "hurr[ied]" in 2014 because "they did not want me to attend the off site" and "I was told that some people were not – I don't recall who said it, but someone was not comfortable with a gay man at the off site weekend." *Id.* 306:14-19. Mr. Somers could not recall who made the statement because he had heard about it through another senior partner who he spoke with after his termination. *Id.* at 307:17-24; 308:1-7. Mr. Somers also did not know any identifying information about the alleged declarant, including their title, race, gender, or sexual orientation. *Id.* at 308:22-309:5. An employer, of course, may not take adverse action against a gay man to acquiesce to the homophobia of other employees. But Mr. Somers has not identified any admissible evidence to prove that that is actually what

16

happened here—the basis for his knowledge about this motivation is double hearsay: another employee allegedly told him that a third employee was uncomfortable with his presence. Furthermore, even if Mr. Somers could substantiate that somebody indeed felt uncomfortable with his presence, he has not introduced any evidence that the unknown person's discomfort influenced Mr. Kumar and Ms. Jacobs' termination decision.

In sum, Plaintiff has not introduced sufficient evidence to support even a prima facie inference that his termination was discriminatory. Nevertheless, even if he had done so, his claim would still fail because, as explained below, Defendants have articulated a legitimate, non-discriminatory reason for his termination, and Plaintiff has failed to meet his burden to show that the reason was pretextual.

### 3. Whether Defendant Has Articulated a Legitimate, Non-discriminatory Reason

Defendants introduce evidence of a legitimate, non-discriminatory reason for discharging Mr. Somers. Namely, in or around February 2014, Defendants discovered e-mails suggesting that Mr. Somers had arranged for a contract between DRT and his brother, Mr. Jeff Somers, to produce a promotional video without disclosing the relationship to DRT. *See* Jacobs Decl., ¶ 36-45, Exs. 9-13. The e-mails show that Mr. Somers was originally in touch with his brother, that his brother sent him a proposed contract/invoice with the brother's name, but that the contract/invoice was then revised to remove any reference to Mr. Somers' brother before being forwarded to other DRT personnel for approval. *Id.* Mr. Somers himself approved the contract. *Id.* ¶ 41, Ex. 11. He then sent a separate e-mail to his brother informing him the contract had been signed. *Id.* ¶ 43, Ex. 12.

When confronted by Human Resources, Mr. Somers admitted that he did not tell his supervisor, Mr. Kumar, about his brother's role in the deal. Mr. Somers had not disclosed the arrangement to his supervisors either. Somers Depo. 408:12-16, 409:1-14. He did not think Mr. Kumar would care and also attempted to justify the deal by saying that it was inexpensive. Schubert Decl. ¶¶ 34-36, 41; Da Luz Decl., ¶¶ 3-8, Ex. 8 (including contemporaneous notes of conversation). More to the point, Mr. Somers admitted that he had removed his brother's name from the contract to avoid controversy and questions from others. Schubert Decl., ¶ 38; Da Luz Decl. ¶ 5, Ex. 8. Mr. Somers' efforts to conceal his brother's connection to the deal and his later

efforts to justify it led Ms. Jacobs and Mr. Kumar to question Mr. Somers' judgment based on the lack of transparency and the failure to see the potential conflict of interest. Jacobs Depo. 78:24-79:8, 384:18-23.

During the same interview about the deal with his brother, Ms. Jacobs asked Mr. Somers whether he had hired one of DRT's vendors to paint his apartment in Singapore. Mr. Somers admitted that he had done so. Somers Depo. 117:9-118:18, 418:18-420:24; Jacobs Decl. ¶ 52; Da Luz Decl. ¶ 7. This also constituted a possible conflict of interest to the extent a vendor might feel pressured to give Mr. Somers a special deal in order to preserve a contract with DRT. Jacobs Decl. ¶ 46.

Together, these incidents led Ms. Jacobs and Mr. Kumar to lose confidence in Mr. Somers' leadership due to his lack of transparency, failure to see the potential conflicts of interest, and attempt to justify what he did after the fact. Jacobs Depo. 78:24-79:8, 384:18-23. These incidents constituted a violation of DRT's Code of Business Conduct and Ethics. Jacobs Decl. ¶ 61. These two events were also the basis for Defendants' termination decisions. Jacobs Depo. 78:24-79:8, 384:18-23.

Plaintiff does not dispute that he contracted with his brother on behalf of DRT or that he hired a DRT vendor for personal services without disclosing his relationships to his superiors. Thus, there is no genuine dispute of material fact that Plaintiff's failure to disclose a deal with his brother and his failure to disclose the retention of DRT's vendor for personal work constitute legitimate, non-discriminatory reasons for dismissal. *Cf. Knight v. Brown*, 485 Fed.Appx. 183, 184 (9th Cir. 2012) (holding that violation of code of ethics and security policy and procedures constitutes a legitimate, non-discriminatory reason for adverse employment action that shifts burden to plaintiff).

    4.     Whether Plaintiff Has Marshaled Sufficient Evidence of Pretext

Under *Vasquez*, the burden shifts to Plaintiff to demonstrate that Defendants' stated reasons for termination were pretextual. "A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641. Direct evidence probative of

pretext includes "[a] showing that the [employer] treated similarly situated employees outside [the plaintiff's] protected class more favorably." *Id.* Indirect proof must consist of "specific and substantial evidence challenging the credibility of the employer's motives." *Id.* at 642.

a.    <u>Plaintiff Has Not Introduced Admissible Evidence to Demonstrate Pretext</u>

Plaintiff fails on both counts. In his opposition brief, Plaintiff claims that he "made numerous firsthand observations of serious misconduct by heterosexual males." Opp. at 12. He reported "an employee who owned and ran a chain of yogurt shops on company time," but Mr. Kumar "refused to take action or report the matter." *Id.* Mr. Somers also claims that Mr. Kumar gave "no-bid contracts" to "long time friends and unsubstantiated payments to others in his hometown of Sydney, Australia." Finally, Mr. Somers states there was "the hiding of seven million dollars in cost overruns on a development in Hong Kong and a lack of transparency on a new project in Osaka, Japan," but he does not say who was responsible for it. He claims that none of these employees were disciplined and that one was actually promoted.

As a preliminary matter, Plaintiff's allegations are bare assertions in a brief; he has not presented any evidence to substantiate his claims. The failure to produce *evidence* to demonstrate pretext despite ample opportunity to do so is itself dispositive.

Even if Plaintiff could introduce evidence in support of the assertions in his brief, however, the enumerated examples would not raise a reasonable inference of pretext. For the pretext analysis, "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. "The employees need not be identical, but must be similar in material respects." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011). Violations of company rules may be "similar" even if not identical where the underlying "policies and procedures all serve the same purpose" and the violations are of "comparable seriousness." *Id.* at 1115.

Here, none of Plaintiff's examples involve employees who leveraged their position at the company (or created an appearance of such leverage) to obtain personal benefits for themselves or their family members. *Cf. Vasquez*, 349 F.3d at 641-42 (higher level and lower level employees not similarly situated, nor were two employees who violated supervisor's order similarly situated

19

where one was unaware of the supervisor's order). Although the incident involving Mr. Kumar's non-bid contract to a "friend" might arguably be similar to Mr. Somers' violation at least in an abstract sense, Mr. Somers has not claimed—let alone introduced evidence—that Mr. Kumar extended such bids in a non-transparent way or without complying with company policies or procedures. Mr. Somers not only arranged a deal with his brother, but actively concealed his brother's connection by removing his name from the contract. Finally, Plaintiff does not claim that Human Resources was aware of the violations by these other employees or that he took any steps to report them; thus, Plaintiff cannot prove that Human Resources imposed less severe discipline on the employees even after confirming their misconduct.

For these reasons, Mr. Somers failed to marshal evidence to support a reasonable inference of pretext.

> **b.** <u>Plaintiff's Assertions of Pretext Fall Short in Light of the Applicable Presumptions Against a Finding of Pretext</u>

Plaintiff's failure to produce evidence of pretext is dispositive even under the *Vasquez* standard discussed above. Two additional presumptions diminish Plaintiff's claim of pretext: the fact (1) that Defendants terminated a similarly situated employee for similar misconduct, and (2) that Mr. Somers was terminated by the same individuals who previously approved his transfer, gave him positive performance reviews, and approved raises and bonuses.

With respect to similar discipline against similarly situated employees, Defendants point to the example of Maureen Roth, a heterosexual female, who was the Director of Property Operations at DRT's Boston location. She received permission to secure an apprenticeship for her son at one of DRT's vendors, but failed to disclose that her son would be working with the vendor at a DRT facility. Jacobs Decl. ¶¶ 78-80; Da Luz Decl. ¶¶ 9-12. Due to the failure to disclose, Ms. Roth was terminated. Jacobs Decl. 80; Da Luz Decl. ¶¶ 10, 12. Evidence that "shows that at least one other similarly situated employee . . . was treated in a similar manner . . . negat[es] any showing of pretext." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001). Indeed, Mr. Somers' conduct is arguably more severe than Ms. Roth's: Mr. Somers engaged in two instances of potential conflicts of interest (not only one) and he failed to disclose both; Ms.

20

Roth at least made a partial disclosure. Plaintiff's burden to demonstrate pretext is thus even higher where similarly situated persons were treated consistently, even when their conduct was arguably less severe than his own.

Plaintiff's burden is also heightened by the "same actor" inference. In *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir. 1996), the Ninth Circuit held that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Id.* at 270-71. In *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005), the Ninth Circuit explained that the principle is not limited to hiring and firing, but rather applies more broadly to any positive employment action followed by an adverse action. The basis for this inference is "the principle that an employer's initial willingness to hire the employee-plaintiff [or treat him favorably] is strong evidence that the employer is not biased against the protected class to which the employee belongs." *Id.*

Here, Mr. Somers was openly gay in the workplace. Mr. Kumar approved Mr. Somers' transfer from Ireland to Hong Kong knowing that he was openly gay, Jacobs Decl. ¶¶ 3-4, Jacobs Dep. 220:4-9, Amended Compl. ¶ 12, and then praised his performance and routinely approved his bonuses, which Mr. Somers claims were always over the maximum range, Somers Depo. 19:6-25, Amended Compl. ¶ 17. Indeed, as Mr. Somers claimed at the hearing, Mr. Kumar was providing positive feedback and financial rewards a mere 2 or 3 months before his termination. Defendant Jacobs also knew Mr. Somers was gay yet also approved his transfer and bonuses. Jacobs Decl. ¶¶ 3-4, Jacobs Dep. 257:12-22. Ms. Jacobs and Mr. Kumar, however, were also the same people who decided to terminate Mr. Somers. Mr. Somers has not "proffered evidence suggesting that [Defendants] developed a bias against [gay men]" in the interim period. *Coghlan*, 413 F.3d at 1097. Under *Bradley* and *Coghlan*, these circumstances give rise to an even stronger inference that Defendants' reasons for termination were not pretextual.

For the reasons above, Plaintiff has not introduced evidence sufficient to support an inference that Defendants' proffered explanation for the termination is pretextual.

5. <u>Plaintiff Has Not Brought a Hostile Environment Claim and Has Also Failed to Produce Evidence to Support One</u>

Plaintiff did not explicitly bring a claim alleging a hostile environment due to co-worker harassment under Title VII in his Amended Complaint. However, Defendant moves for summary judgment arguing that the evidence identified by Mr. Somers would not support such a finding. This does not appear to be a disputed issue due to Plaintiff's failure to properly plead a hostile environment claim, but even if it had been properly pled, the Court would grant Defendants summary judgment on this record.

To make out a hostile environment claim, a plaintiff must show "(1) that he was subjected to verbal or physical conduct of [e.g.] a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642. "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citations omitted). Moreover, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Id.* (quotation and citation omitted).

Mr. Somers falls far short of this standard. As explained above, *see supra* Section III.B.2, most of the examples he cited as evidence of discrimination in his deposition are not linked to his sexual orientation in any way. The closest claims were those related to Mr. Yabsley's "limp wrist" gestures and other comments about gay men, and those related to the mysterious disappearance of photographs of him and his male partner from his desk while he was on vacation. However, there is no indication that these conditions were "sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642. To the contrary, Mr. Somers never reported the incidents to HR. His memory of the incidents was also vague, suggesting they were not sufficiently serious to him at the time on a subjective level. Also, the few events Mr. Somers cites appear to have occurred only occasionally.

Nor has Mr. Somers identified any overt hostility or harassment directed at him based on his sexual orientation. *Compare Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1035 (9th Cir. 2005) ("numerous demeaning comments about women" such as "women should only be in subservient positions," "have no business in construction," that women "were being paid more than they deserved," and that male supervisor "exhibited hostility to women who took maternity leave, and . . . told sexually explicit jokes in the office" were sufficiently serious to satisfy severe and pervasive standard) *with Vasquez*, 349 F.3d at 643 (two comments spread apart by six months that plaintiff had "a typical Hispanic macho attitude" and that he should consider transferring because "Hispanics do good in the field" were not sufficiently severe or pervasive to create a hostile working environment, even when supervisor also yelled at plaintiff and made two false complaints about him over the course of a year).

Accordingly, even if Plaintiff had properly alleged a hostile environment claim in this case, he has failed to present evidence of a genuine dispute of material fact that it was sufficiently severe or pervasive as to undermine the conditions of his employment.

$$* \qquad * \qquad *$$

For these reasons, Plaintiff has failed to demonstrate a genuine dispute of material fact with respect to his Title VII claim. Defendants' motion for summary judgment under Title VII is **GRANTED**.

C. Section 1102.5 (retaliation against whistleblowers)

Defendants move for summary judgment on the basis that California Labor Code Section 1102.5 may not be applied extraterritorially, and, even if it could, Plaintiff has failed to identify any law which he reasonably believed Defendants to be violating.

1. Extraterritoriality

Defendants dispute that Section 1102.5 applies extraterritorially, but the Court need not resolve the issue. Even assuming that Section 1102.5 applies extraterritorially because the retaliatory termination decision was made in California, *see Leibman v. Prupes*, 2015 WL 3823954, at *8 (C.D. Cal. Jun. 18, 2015) (permitting Section 1102.5 claim to go forward where "the alleged decision to retaliate . . . occurred in California"), Plaintiff fails to present evidence of

a viable claim on the merits.

2.    Merits

To establish a prima facie case for retaliation under Section 1102.5, an employee must show (1) that he engaged in protected activity, (2) that he was thereafter subjected to an adverse employment action by his employer, and (3) that there was a causal link between the protected activity and the adverse employment action. *Morgan v. Regents of University of California,* 88 Cal.App.4th 52, 69, 105 Cal.Rptr.2d 652 (2000).

Defendants argue that Plaintiff cannot prevail because he has not identified any protected activity: he admits that he did not know of any laws that were allegedly violated by the misconduct he reported. Indeed, at his deposition, Mr. Somers admitted that he was never asked to undertake any illegal behavior. *See* Somers Dep. 61:18-19 ("Q: Did Mr. Kumar ever ask you to do anything illegal? A: Not that I recall."). Instead, he claimed that he was asked not to follow company policies or procedures relating to budgeting. Somers Dep. 61:25-62:166. Mr. Somers also claimed that another employee, Peter Adcock, was given the same instruction. *Id.* 76:5. Specifically, Mr. Somers understood that Mr. Kumar had told Mr. Adcock "to exclude certain aspects of gating approvals." *Id.* 77:12-13. But Mr. Somers also testified that he was not aware of any law regulating the gating process. *Id.* 283:17-19. Nor was he aware of any law regulating the process for budgeting at DRT. *Id.* 297:23-298:2. In his opposition brief, Mr. Somers has not identified any evidence or even argued that he believed Defendants were violating a law.

Mr. Somers' inability to identify a reasonable belief that a violation of *law* was transpiring is fatal to his claim; Section 1102.5 does not protect persons who merely report the violation of internal company rules or policies. *See Golt v. City of Los Angeles*, 214 Fed. Appx. 708, 713 (9th Cir. 2006) (alleged unfair enforcement of internal discipline rules is not protected by Section 1102.5 because the conduct "did not violate any federal or state statute, rule, or regulation"); *Carter v. Escondido Union High School Dist.*, 148 Cal.App.4th 922, 933 (2007) (disclosure that a coach had "recommended a protein shake to a student" was not protected by Section 1102.5 because the behavior did not violate any laws or regulations and the record was devoid of evidence that reporting individual held such belief); *Love v. Motion Indus., Inc.*, 309 F.Supp.2d 1128, 1134

United States District Court
Northern District of California

(N.D. Cal. 2004) (2004) (employee who voiced concerns based on non-compliance with internal standards had not demonstrated protected activity because he "offered no specific facts indicating that these specifications are grounded in any statute, rule, or regulation").

Because there is no genuine dispute of material fact, Defendants' motion for summary judgment under California Labor Code Section 1102.5 is **GRANTED**.

D.    Common Law Breach of Contract

In his complaint, Plaintiff alleged that he was employed "under a contract that was partly written and partly implied," and that Defendant breached the contract in a host of ways ranging from failure to follow internal discipline policies, termination without just cause or in contravention of company policy, failure to reimburse certain expenses upon termination, and failure to pay the appropriate cost of living allowance for a couple (Plaintiff and his partner) rather than a single person. Amended Compl. ¶ 62. In his opposition, Plaintiff makes no legal or evidentiary argument whatsoever regarding his breach of contract claim, except to assert, without citation to evidence, that he was "contracted and promised to pay company stocks in California USA." Opp. at 9. Thus, the asserted failure to pay those stocks appears to be the sole theory that Plaintiff continues to assert, although it is not alleged in his complaint and the cursory remark is not accompanied by an explanation or any supporting evidence.

Defendant argues that Plaintiff may not pursue his breach of contract claims because California contract law cannot be applied extraterritorially, he cannot demonstrate a breach, and his failure to mitigate damages precludes a claim.

1.    Extraterritoriality

Defendants have also raised an extraterritoriality challenge to Plaintiff's claim for breach of contract. The presumption against extraterritoriality typically applies in addressing the substantive scope of a statute. *Leibman*, *supra*, 2015 WL 3823954, at *6. In the context of this breach of contract claim which is governed by common law, Defendants appear to confuse the question whether the Court has power to adjudicate the case (*i.e.*, personal and subject-matter jurisdiction) with the question of whether California's substantive contract law applies to the breach. Defendants have not challenged the Court's jurisdiction (nor have they raised a venue

25

challenge), and it is undisputed that the parties have entered into three contracts with one another. Accordingly, the material question is not whether California breach of contract law applies extraterritorially, but rather, which jurisdiction's laws govern the contract. A choice-of-law analysis is needed.

"A federal court ordinarily applies the choice-of-law rules of the state in which it sits." *Consul Ltd. v. Solide Enter., Inc.*, 802 F.2d 1143, 1146 (9th Cir. 1986). Under California choice-of-law rules, courts apply a "governmental interest analysis" which looks to (1) "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different;" (2) "if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists;" and (3) "if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law . . . and then ultimately applies the law of the state whose interest would be the more impaired if its laws were not applied." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994-95 (9th Cir. 2010) (citations and quotations omitted).

Plaintiff maintains that California is one of the affected jurisdictions because that is where the termination decisions and therefore the alleged breaches occurred. Defendants, on the other hand, maintain that Plaintiff never worked in California and that the breaches actually occurred in Singapore, where he was fired and performed all of his work. Ultimately, resolution of the issue is unnecessary because it does not materially affect the outcome here, as explained below with respect to each contract.

The first contract is a restricted stock agreement signed by Plaintiff and effective on February 11, 2013. Jacobs Decl., Ex. 2. It explicitly provides that it "shall be administered, interpreted and enforced under the internal laws of the State of California without regard to conflicts of laws thereof." *Id.* at 9 (PS 186).[8] Thus, even if the presumption against extra-territoriality applied, the contract explicitly states it will be governed by California law, so

---

[8] The page numbers cited are to the ECF pagination of the PDF document and, in parentheses, the Bates stamp.

permitting Plaintiff's claim to proceed would not result in improper extraterritorial application of California contract law. Indeed, this clause means that regardless of the forum in which Plaintiff brings his contract claim, the adjudicator will apply California substantive law to the agreement.

The second contract is Plaintiff's original May 2010 terms of employment at the time of his initial hire to Defendant's Chicago office. Jacobs Decl., Ex. 3. The third contract is Plaintiff's November 1, 2013 "Letter of International Assignment" describing "the terms and conditions applying to the extension of your international assignment with Digital Realty . . . in Singapore." Jacobs Decl., Ex. 7 at 41 (1). Illinois and Singapore are clearly "affected" for purposes of the choice-of-law analysis the contracts were executed in either location or for performance in either location. *Pokorny*, 601 F.3d at 994. In contrast, the contracts do not contain a choice-of-law provision, were not executed in California, and do not require performance in California. The only connection to California is, arguably, Plaintiffs' allegation that the termination decision was taken in California. The connection to California appears to be minimal. In any event, whichever substantive law of contract applies, the parties have not claimed that the laws of these jurisdictions differ in any material way with respect to Plaintiffs' breach of contract claim.[9] Plaintiffs' contract claims on the merits fails under basic, black-letter common law contract principles. Because no material conflict of laws has been asserted, the Court will apply California contract law here.

2. Merits

Defendant is entitled to summary judgment for breach of the May 2010 and November 2013 employment contracts to the extent Plaintiff's theory of breach rests on an alleged discharge without just cause or in non-compliance with company policies. Both agreements explicitly provide that Mr. Somers is an at-will employee and modifications to that status may only be made in writing. *See* Jacobs Decl., Ex. 3 at 17 (2) ("Your employment with the Company is at-will . . . . [T]he Company has the right to terminate your employment at any time, or otherwise discipline, transfer, or demote you at any time, with or without reason, cause or advance notice, at its sole

---

[9] Singapore has adopted the English common law. *See* Application of English Law Act § 3(1) (Sing.) ("The common law of England (including the principles and rules of equity), so far as it was part of the law of Singapore immediately before 12th November 1993, shall continue to be part of the law of Singapore.").

discretion."); *id.*, Ex. 7 at 41 ("This letter is not intended to be a contract or a promise of employment for a fixed term."). Mr. Somers has not introduced any evidence of such modifications. Accordingly, he cannot demonstrate a breach based on termination without cause.

To the extent that Mr. Somers alleged that Defendants failed to pay relocation costs associated with repatriation to the United States, the November 2013 Letter of International Assignment provides that relocation costs will be covered in case of involuntary termination for performance, but "only if they are incurred within thirty days after the effective date of the separation." Jacobs Decl., Ex. 7 at 43 (3). Defendants argue this term means "he had to take advantage of the repatriation benefit within 30 days," Mot. at 24, but Plaintiff only needed to have "incurred" the costs within 30 days—not necessarily to have requested reimbursement within 30 days. In any case, Plaintiff has not introduced any evidence that he actually incurred unreimbursed costs between April 9, 2014 (the date of his termination) and May 9, 2014 (the expiration of benefits). Furthermore, the record evidence suggests he did not repatriate until after that date, so he would not have incurred expenses within the 30-day time period. *See* Jacobs Decl. ¶ 69. Accordingly, Plaintiff has failed to show a genuine dispute of material fact with respect to a breach or even any damages for failure to reimburse repatriation costs.[10]

To the extent Plaintiff alleged that Defendants failed to pay the balance of his apartment lease in Singapore, he has introduced no evidence that Defendants were contractually obligated to pay those expenses after his termination. His Letter of International Assignment only provides that "[y]ou will be provided with a housing and utilities allowance *while on assignment*." Jacobs Decl., Ex. 7 at 43 (3) (emphasis added). Moreover, Plaintiff's lease agreement was solely between him as an individual and the landlord; Defendants were not parties. Jacobs Decl. ¶¶ 61, 63; Ashe Decl., Ex. 25 (Singapore court judgment against Mr. Somers by landlord for S$181,000 in rental arrears and related damages). Although Defendants offered to take over the lease, that was on the condition that Plaintiff vacate the property and permit Defendants to interact with his landlord—he refused to do both, so no enforceable agreement was formed. Jacobs Decl. ¶¶ 62-67, Exs. 22, 26,

---

[10] Defendants also assert that Plaintiff failed to mitigate damages; because Plaintiff has not introduced any damages evidence, this issue is moot.

28.  In the absence of a contract, there can be no breach.

Furthermore, even if Plaintiff had proven the existence of a contract and a breach with respect to his apartment lease, he has not demonstrated that his damages were caused by Defendants' breach.  Plaintiff interfered with Defendants' efforts to terminate the lease and vacate the apartment at the end of his employment, and he specifically forbade Defendants from communicating with the landlord.  *See* Jacobs Decl. ¶¶ 62-64, Exs. 22, 26, 28 (Ms. Jacobs' e-mails offering to help Mr. Somers negotiate an end to his lease, but Mr. Somers refuses and instructs Ms. Jacobs to refrain from any contact with his landlord).  Also, Plaintiff failed to mitigate his damages by, *e.g.*, vacating the apartment in a timely manner and permitting Defendants to help him negotiate an early termination with the landlord.[11]

Finally, to the extent Plaintiff alludes to an alleged breach of his stock purchase agreement in his brief (but did not allege one in his complaint), he has failed to introduce evidence of a breach (or even to articulate his theory of breach).  Furthermore, the stock agreement provides that any "restricted shares" are forfeited immediately upon termination for any reason, *see* RSA, Section 2.1 (Jacobs Decl., Ex. 2), and Exhibit A to the RSA specifies that as of the date of his termination (April 11, 2014), all of Mr. Somers' stock entitlements were "restricted" except for 316, *id*.  Mr. Somers has not introduced evidence or even claimed that those 316 unrestricted shares were not delivered to him.  Thus, he has failed to introduce evidence of a breach of the RSA.

For these reasons, Plaintiff fails to demonstrate a genuine dispute of material fact with respect to his contract claims.  Defendants' motion for summary judgment is **GRANTED**.

E.    Defamation

Plaintiff also alleges that Defendants defamed him by claiming he (1) violated company policies, (2) was a poor performer, (3) was "squatting," and (4) was violating immigration laws.  Amended Compl. ¶ 68.  Defendants argue that the claim cannot be brought extraterritorially and

---

[11]  Magistrate Judge Westmore has already determined as an issue sanction that Mr. Somers failed to mitigate his economic damages, based on his failure to comply with the Court's discovery orders that he produce evidence of mitigation efforts.  *See* Docket No. 319 at 29, 31.  In any case, Mr. Somers did not introduce any evidence of mitigation in support of his motion, either.

1   that, in any case, it fails on the merits.

2       With respect to "squatting," Mr. Somers identified an e-mail from Ms. Jacobs to himself,

3   but did not identify any other place where the accusation was made or published. Somers Depo. at

4   443:8-15, 443:16-24. With respect to his "poor" performance, Plaintiff claims that "[s]omeone"

5   told persons outside of DRT that he was a "poor performer," but he did not know who. *Id.* at

6   443:25-444:5. They apparently shared "[c]ommon knowledge what was in my file . . . to several

7   people that should not have had access to it." *Id.* at 444:7-9. It was shared with "Scott Peterson.

8   And Mike Derra, Kathryn Gudgian, recruiters." *Id.* at 444:11-13.[12] However, Mr. Somers does

9   not know who shared the information. *Id.* at 447:6-22. There does not appear to be evidence

10   related to statements about violating company policy or immigration law in the record, so they are

11   not at issue.

12       1.   <u>Extraterritoriality</u>

13       As discussed above, the presumption against extraterritoriality typically applies in

14   addressing the substantive scope of a statute. *Leibman*, *supra*, 2015 WL 3823954, at *6. No party

15   challenges the Court's jurisdiction or venue. Accordingly, as to the common law claim of

16   defamation, the question here is most appropriately framed as a question of choice-of-law: Does

17   California defamation law apply? Neither party seeks to apply the substantive law of another

18   jurisdiction (such as Singapore). For the same reasons stated above, because Plaintiff's claims fail

19   on the merits under elementary, black-letter principles of common law defamation, and because

20   there does not appear to be a material conflict in laws, the Court will apply California law.

21       2.   <u>Merits</u>

22       Even if Mr. Somers could establish that Ms. Jacobs published the defamatory statements

23   from California, and thus California law applied, he would fail on the merits. "Defamation

24   constitutes an injury to reputation; the injury may occur by means of libel or slander. In general . .

25   . a written communication that is false, that is not protected by any privilege, and that exposes a

26   person to contempt or ridicule or certain other reputational injuries, constitutes libel." *Shively v.*

27

28   [12] Though the record contained no evidence about who these people were, the parties at the hearing agreed they were all DRT employees (except for the unidentified recruiters).

*Bozanich*, 31 Cal.4th 1230, 1242 (2003) (citing Cal. Civ. Code §§ 44-45). One of the elements of defamation is "publication," which requires that a "defamatory statement [be] communicated to a third person who understands its defamatory meaning as applied to the plaintiff." *Id.*

**"Squatting" Comment:** At his deposition, Plaintiff conceded that he was unaware of any other person to whom Ms. Jacobs sent the e-mail in which she stated that he was "squatting" in the apartment. Somers Dep. 443:14, 24. The lack of any evidence of a publication defeats the defamation claim with respect to the "squatting" comment.

**"Poor Performer" Comment:** With regard to the "poor performance" allegation, Plaintiff stated that he was unaware of any person outside of DRT who had been told that he was a poor performer. Somers Dep. 443:25-444:5. However, he claimed that it was "[c]ommon knowledge" that the poor performance issues were in his file to "several people that should not have had access to it," including Scott Peterson, Mike Derra, and Kathryn Gudgan. *Id.* at 444:7-13.[13] There is no evidence in the record regarding who these individuals were, but at the hearing the parties agreed that they were DRT employees. Mr. Somers did not know or state how those individuals found out. *Id.* 447:6-15 (stating "I don't know" when asked who told each individual about the poor performance comment). Plaintiff lacks admissible evidence to prove a publication.

Even if Plaintiff had established a factual foundation for his assertion that publications were actually made, Plaintiff has not introduced evidence that *Defendants* were responsible for the publication. But Plaintiff has not marshaled any evidence to show that Ms. Jacobs was the source, so has not linked her to the illicit disclosures.

Defendants also argue that the statement that Plaintiff was a poor performer is true as demonstrated by his violation of company policies. The record contains undisputed evidence of two serious incidents of misconduct: contractual relationship with a company where Mr. Somers' brother worked while concealing the relationship, and retention of one of DRT's vendors to paint his personal apartment. Misconduct is an example of poor performance. Thus, even assuming that Plaintiff had introduced evidence of a publication, Defendants would be entitled to summary

---

[13] Defendants have not submitted declarations denying any publication to these individuals.

judgment because the alleged statement is true.

For these reasons, Defendants' motion for summary judgment on the defamation claim is **GRANTED**. The Court need not reach Defendants' alternative affirmative defense under the qualified privilege. *See* Cal. Civ. Code Section 47(c).

F.      Wrongful Termination

Finally, because Defendants have prevailed with respect to the Title VII and Section 1102.5 claims, Defendants are also entitled to summary judgment on Plaintiff's wrongful termination claim. Plaintiff has not shown that he was terminated in violation of a fundamental policy established by a constitutional, statutory, or regulatory provision—even assuming this claim could properly be asserted extraterritorially. *See Green v. Ralee Eng'g Co.*, 19 Cal.4th 66, 79-80 (1998). Defendants' motion for summary judgment on the wrongful termination claim is **GRANTED**

## IV.      CONCLUSION

For the reasons above, Defendants' motion for summary judgment is **GRANTED**. Plaintiff failed to present evidence to make a prima facie case that his termination was based on his sexual orientation under Title VII. Even if he had, he failed to present evidence to show that Defendants' legitimate, non-discriminatory reason for terminating him (violation of company ethics policies) was pretextual. Plaintiff also failed to identify any law that he believed Defendants to be violating when he reported misconduct, and thus his claim under California Labor Code Section 1102.5 fails. As a result, his common law wrongful termination claim fails as well. Finally, Plaintiff has not submitted any evidence to support his breach of contract and defamation claims.

///

///

///

///

///

///

1       In light of the Court's holding, Defendants' pending motion for terminating sanctions is

2  denied without prejudice as moot.  *See* Docket No. 352.  In addition, Defendants' motion in limine

3  to exclude evidence that was not disclosed in discovery is denied as moot, as Plaintiff has not

4  introduced such evidence (indeed, he has introduced none).  *See* Docket No. 332.

5       This order disposes of Docket Nos. 331, 332, 346, and 352.  The Clerk of the Court shall

6  enter judgment for Defendants and close the case.

8       **IT IS SO ORDERED**.

10  Dated: August 6, 2018

_____
EDWARD M. CHEN
United States District Judge

33